(January 5, 1907.)

## STATE, Respondent, v. IRA BAIRD, Appellant.

[88 Pac. 233.]

CRIMINAL LAW—EVIDENCE OF FLIGHT—EXPLANATION OF FLIGHT—CON-
FLICT OF EVIDENCE.

1. Where a defendant has been indicted and arraigned, and the
time fixed for him to plead, and prior to entering his plea he
flees from the state, and is thereafter apprehended and brought
back and placed upon his trial, evidence of his flight is admissible
as a circumstance tending in some degree to disclose a conscious-
ness of guilt in the mind of the defendant, and is entitled to be
considered by the jury in arriving at their verdict.

2. ID.—In such case, the defendant is entitled to submit any
evidence he may have tending to explain his flight, or tending to
show the reasons and considerations which led him to take such ac-
tion.

3. Evidence in this case examined and considered, and *held* not
sufficient to support the verdict and judgment of conviction.

(Syllabus by the court.)

APPEAL from the District Court of Seventh Judicial Dis-
trict for Washington County. Hon. Frank J. Smith, Judge.

Defendant was convicted of the crime of grand larceny and
sentenced to serve a term in the state penitentiary. He ap-
pealed from the judgment and an order denying his motion for
a new trial. *Affirmed.*

Hawley, Puckett & Hawley, for Appellant.

J. J. Guheen, Attorney General, Edwin Snow and George
P. Rhea, Prosecuting Attorney, for the State.

SULLIVAN, J.—The defendant was prosecuted on informa-
tion charged with the larceny of one horse, four mares and
three colts, the property of Charles Anderson, and was con-
victed and sentenced to serve a term in the state penitentiary.
He has appealed from the judgment and an order denying
his motion for a new trial, and for a reversal thereof relies on

the insufficiency of the evidence to sustain the verdict. The defendant, while gathering horses from the public range in Washington county, in December, 1903, also gathered the animals he is charged with stealing, and brought them, together with his own, into the corral at Midvale, Washington county. He was arranging to ship a carload east, and had already engaged a car for that purpose. After arriving at the station on the P. I. & N. road, he endeavored to borrow money from two or three different parties necessary to prepay the freight and other charges for shipping the animals. He was not successful in his effort, however, to borrow the money, but during the time he was negotiating for means he was approached by a party to buy one of the animals he had in the corral. Defendant testifies that as soon as his attention was called to this particular animal, and he noticed the brand on it, he saw at once it was not his animal, and he gave some excuse for not wanting to sell that animal, and did not sell it. He says he then discovered that he had animals in the corral that did not belong to him, and concluded that the best thing to do was to return them to the range. He did sell two other animals to this purchaser—one, about which there is no question but that he was the owner, and an unbranded spring colt which he claims to have raised and owned. The prosecuting witness, Anderson, testified that he was the owner of this colt, and he brought other witnesses to testify to the same fact. Defendant was equally positive that he owned the colt and brought witnesses to testify to that fact. After he failed to secure means to pay the expense of shipping the animals, he drove his own, together with the animals that he did not claim, back to the public range. However, he did not take them to the range from which he had gathered them, but took them in that direction, and said that he presumed they would go back to the old range. It seems to be conceded on both sides that the defendant, if guilty of the crime of larceny, is only guilty for the theft of the colt in dispute. There is a direct conflict in the evidence as to the ownership of the colt, and if the verdict stood alone on that evidence it would be doubtful if it could

be sustained.    It is further shown, though, that after defendant had been indicted—and the time had been fixed for him to plead—that he fled from the state and went to British Columbia, where he was later apprehended and brought back to Idaho and held for trial.    This fact, while not within itself evidence of guilt, is a circumstance everywhere held to be proper evidence to go to the jury, as tending to disclose a consciousness of guilt in the mind of the defendant.    (Underhill on Criminal Evidence, 147 et seq.; 12 Cyc. 395, and notes.)    Such evidence may be fully and clearly explained by the defendant, and in any event he has the right to offer any explanation he may have.    So the defendant did in this case, but his explanation is not very satisfactory, and evidently did not satisfy the jury.    His explanation in full is as follows: "I shipped (a car-load of horses) from here on the 9th of August; I shipped to Bristol, Tennessee; I guess I was in and around there up until about the 2d or 3d of October; I was aware that I had to be back here by the time court met—in some way I was mistaken as to the time of court; it was called for the last days of September, and I thought it would be called a month later—the last days of October I thought it was to be called. I got a telegram while I was in Bristol that court was in session, and I wired back that I was coming at once. I had a few horses left that I sold at a sacrifice, and I boarded the train and got here as quick as I could; I got left in Denver and that caused me to lose one day.    I missed the train when I got here in Weiser; I was in the sleeping-car and they failed to wake me up and carried me through to Huntington.    I was on the morning train that gets me there at 3 o'clock, and I had to wait in Huntington and come back on the cannon-ball, and got in, I think, on the 6th or 7th of October; I went to Mr. Feltham, my attorney, to see him, and he was not in; I had not seen my wife for a couple of months; she was down in the valley at Mr. Hindman's and I went on down there, and while I was there the deputy sheriff, or some official under the sheriff, came and wanted me to appear at the courthouse, and I told him that I intended to go up, and

I came right up; I came into the courtroom and Mr. Feltham was there, and he said to the court that he was my attorney; the judge told me to appear next morning for trial; my attorney petitioned for more time—he said he was expecting assistant counsel, and did not have time to prepare for the trial at all; the judge answered very short, and said that he had had all summer; 'if the defendant has been careless it is his own fault; he shall appear to-morrow morning to plead.' I went down to Mr. Feltham's office and waited until he came from the courthouse; he came there and reprimanded me for my negligence in not appearing; he said it gave him no show to fix up the case. I asked him what witnesses he wanted, and told him where they were, and he said he was satisfied from the way the judge spoke and the way everything was that I would be arraigned the following afternoon, at least after the case being tried then, and he was satisfied the prosecution wanted to try me before Portlock, and he said he knew it was going to be rushed right through, as there was no plausible excuse for me turning up so late, and then he gave me quite a reprimand for not being there. He said I was to wire to Mr. Hawley, and to try and get him to come down on the night train as assistant counsel, and he said that he would confer with him in the morning and do what he could to fix up the case before the case was called. I left Mr. Feltham's office then and did not appear. I left the country that night and went to Alberta, Canada; my reason for leaving was that I thought from what my attorney said I was not going to have any time, and I was quite positive I could not get ready to make my defense, having no time. I was quite positive in my own mind that I would be sent to the penitentiary, and I did not want to be railroaded to the penitentiary, and I left."

After receiving the telegram referred to, he immediately returned to Idaho and did not try to keep out of the jurisdiction of the court. But when he found that he did not have time to prepare for trial he was fearful that he would be convicted, and left the state. He went into business in British Columbia in his real name, and sent letters from there to his

wife and father residing in Washington county, Idaho, and this would indicate that he made no effort to keep his where-abouts a secret. We think a reasonable deduction and infer-ence from the fact of his flight is, that he was alarmed by the remarks of the judge, and on consultation with his attorney believed that he would not be given time to prepare his de-fense, and was afraid that he would be convicted because of not having sufficient time to properly present his defense, and fled for that reason rather than because of a consciousness of guilt. We are clearly of the opinion that without the circum-stances of his flight the other evidence is not sufficient to war-rant a conviction. We therefore conclude that the judgment of the trial court must be reversed and a new trial granted, and it is so ordered.

Stockslager, C. J., concurs.

AILSHIE, J., Dissenting.—I agree with my associates to the extent that the evidence, independent of and aside from the proof of flight, would not be sufficient to support a ver-dict of conviction. The evidence of flight, however, is un-contradicted and undisputed. On the other hand, the de-fendant's explanation of his flight fails to explain and was evidently unsatisfactory to the jury. While, as said by the majority opinion, the remarks made by the court and counsel may have frightened defendant, still the record fails to dis-close any improper or prejudicial remark by either of them. To my mind, the explanation is very unsatisfactory, and, un-der the circumstances disclosed, I am unwilling to join in a re-versal of the judgment.