# HARRIS v. STATE.

(No. 784; Decided January 4th, 1916; 153 Pac. 881.)

APPEAL AND ERROR—EXAMINATION—CRIMINAL LAW—BILL OF EXCEPTIONS—AMENDMENTS—TESTIMONY OF STENOGRAPHER ADMISSIBLE TO SUPPORT CORRECTIONS OF BILL,—EVIDENCE—LARCENY—OWNERSHIP OF PROPERTY—INDICTMENT OR INFORMATION—VARIANCE—RESISTANCE OF ARREST—LEADING QUESTIONS—RELEVANCY—MOTION TO STRIKE—EXPLANATION BY ACCUSED—ADMISSIBILITY—TRIAL—INSTRUCTIONS—DUTY OF JURY IN DELIBERATIONS.

1. Compiled Statutes 1910, Sections 942-944 and 945, defining official duties of court reporters, make their notes taken at trials such a part of the record as to be properly received in evidence with testimony of the reporter and other corroborating evidence in the record relating thereto, to correct the bill of exceptions and make the same conform with the reporter's stenographic notes.

2. In a prosecution for larceny of live stock proof of ownership of a brand found upon an animal is prima facie evidence of the ownership of such animal. (Comp. Stats. 1910, Sec. 6177; Chapter 126, Laws 1913.)

3. Where the information charged the larceny of a cow belonging to "C. E. G." and the proof showed it to belong to "C. E. G. Jr." there was not a fatal variance, the ad-

dition of "Jr." to a name being a mere matter of description, and if a variance at all, its immateriality was insufficient to justify a reversal under Comp. Stats. 1910, Section 6166, prohibiting acquittal on the ground of variance unless material.

4. In a prosecution for larceny, it was error to admit evidence that defendant while under arrest and confined in another state, refused to return for trial pending requisition, since it was his right so to do, and such refusal was neither an incriminating circumstance nor inconsistent with innocence.

5. Evidence of defendant's arrest and imprisonment in another state and of his refusing for several days to return for trial pending a requisition having been erroneously admitted, it was error to instruct the jury that such evidence might be properly considered in arriving at the guilt or innocence of the defendant.

6. Evidence having been admitted showing a refusal of defendant for several days to return to the state without a requisition, it was error to exclude the offer of defendant to further explain his declining at first to return to the state without a requisition, as it was the province of the jury to determine its relation, if any, to the alleged conduct.

7. In a prosecution for larceny of a cow, on the issue of defendant's possession of a cow branded and owned by another, it was error to permit a detective to be asked whether he saw in defendant's possession cattle branded NXN, that being leading and no reason for leading the witness being assigned.

8. Where portions of the testimony of a witness are relevant and competent, it is not error to overrule a motion to strike all of his testimony on the ground of irrelevancy, incompetence and irresponsiveness.

9. An instruction that "it is the duty of each juryman while the jury are deliberating on the verdict to give careful consideration to the views his fellow jurymen may have to present upon the testimony in the case. He should not shut his eyes and stubbornly stand upon the position he first takes, regardless of what may be said by the other jurymen. It should be the object of all of you to arrive at a common conclusion and to that end you should deliberate together with calmness. It is your duty to agree upon a verdict if that is possible," is not erroneous, but the word "candor" should be substituted for "calmness" and a statement added that the verdict should be the verdict of each juror or express the opinion of each.

Error to the District Court, Goshen County; Hon. William C. Mentzer, Judge.

Frank Harris was convicted of the crime of grand larceny. Motion for new trial overruled and defendant brings error. The facts are stated in the opinion.

*Donzelmann & Howell,* for plaintiff in error.

The objection to leading questions propounded to witness, McCarty, should have been sustained. (State v. Ogden, 65 Pac. 449; State v. Burgland, 91 N. W. 318.) Objections to questions propounded to witness, Griffin, as to the condition of defendant's mind should have been sustained on the ground of incompetency. (Territory v. McKern, 26 Pac. 123.) The objection to the question propounded to witness, Karpf, should have been sustained on the ground that it was leading. (People v. Elster, 3 Pac. 384, 3 West Coast, 33; 1 Greenleaf, Secs. 197-199; State v. Ogden, *supra.*)· Also the objection to the question propounded to witness, Karpf, as to the value of the animal in Nebraska, as it was immaterial and incompetent. It was error to admit the Wyoming brand book in evidence, that record showing the brand in question to be owned by another. (Donner v. State, 95 N. W. 40.) It was error to admit the certificate of the State Board of Live Stock Commissioners, which record referred to the brand. (Donner v. State, 100 N. W. 305.) Testimony of witness, Bridges, should have been stricken out, as immaterial. Questions asked witness, McCarty, were leading and should have been stricken. (Hardtke v. State, 30 N. W. 723.) The testimony of witness, Yoder, should have been stricken out, as incompetent. (Donner v. State, *supra;* State v. Jackson, 95 Mo. 623, 652; State v. Martin, 129 S. W. 881.) The testimony of witness, Hayes, should have been excluded for irresponsiveness and immateriality. (State v. Jackson, *supra.*) ·The criminal warrant received in evidence marked Exhibit C should have been excluded. There being no evidence of flight, it was error to admit evidence relating to defendant's arrest in Nebraska and his

refusal to return for trial without a requisition. (Clock v. State, 19 N. W. 542.) The questions asked witness, Saw-yer, objected to by defendant, should have been ruled out. Said questions all relate to transactions in Nebraska, which were irrelevant. The refusal of the court to permit defendant to give testimony in explanation of his refusal to return without a requisition was erroneous. (State v. Baird, 88 Pac. 233.) It was error to permit the cross-examination of defendant with reference to his imprisonment in Nebraska. (People v. Manasse, 94 Pac. 92.) The court erred in refusing defendant's requested instruction number 2. (McNeally v. State, 5 Wyo. 68.) The court erred in refusing to give defendant's requested instructions three and four. (Cablick v. People, 4 Mich. 292; Crim. Def., Vol. 5, p. 531.) The court erred in refusing to give defendant's instructions numbered eight and nine, which were clearly within the law and the evidence. (State v. Young, 82 N. W. 420; Pruit v. People, 5 Neb. 377; Sandage v. State, 61 Neb. 240; Frudie v. State, 66 Neb. 244; O'Grady v. People, 95 Pac. 346; Brickwood Instructions, Sec. 4498.) Instruction numbered eight, given by the court, was erroneous. (Sec. 5827, Comp. Stats. 1910.) And number nine as given was erroneous. (People v. Matthai, 67 Pac. 694.) Instructions numbered ten, eleven, twelve and thirteen as given were erroneous. (State v. Jackson, *supra;* Ingalls v. State, 4 N. W. 785; State v. Walters, 34 Pac. 938; Robinson v. State, 18 Wyo. 217; McNeally v. State, *supra.*) Instruction numbered fourteen was erroneous. (State v. Wittun, 9 N. H. 519; Singleton v. Johnson, 9 M. & W. 67; Richard De Kentland v. Somars, 2 Root, 437.) Instruction numbered fifteen as given might be construed as coercing the jury to agree. The verdict is not sustained by the evidence.

*D. A. Preston,* Attorney General, for the State.

The first assignment of error with reference to testimony concerning where the cattle ranged is without merit. (State v. Ogden, 65 Pac. 449.) The objection made to the question

as to the condition of defendant's mind was practically sustained by the court. Assignments three and four do not present prejudicial error. The allowance of leading questions is largely within the discretion of the court. (Bolton v. State, 146 Ala. 691; Gibson v. State, 47 Tex. C. A. 489; Burch v. State, 49 Tex. C. A. 13.) The several exceptions based upon the admission of evidence with reference to value can hardly be considered prejudicial. (Odell v. State, 44 Tex. C. A. 307.) The Wyoming brand book was clearly admissible as evidence. The assignment of error as to the ownership of the brand was cured by cross-examination. (Rufus v. State, 117 Ala. 131.) The motion to strike out all of the evidence of witness, Bridges, was properly overruled for the reason that plaintiff in error cross-examined the witness fully on all his direct testimony. (Rhodes v. State, 141 Ala. 66; Miller v. State, 130 Ala. 1; People v. Scealomiero, 143 Cal. 343; State v. McDonough, 104 Ia. 6; Wigmore on Evidence, Vol. 1, Sec. 775.) The general assignment of error with reference to twenty-four questions occurring in the testimony of witness, Hayes, all relating to the refusal of defendant to return without a requisition and his efforts to evade arrest, all related to material circumstances, which were proper for the jury to consider. (12 Cyc. 396-397.) The court very properly refused to permit the impeachment of the witness, McCarty, for the reason that his evidence covered immaterial matters. The exceptions taken to instructions given, and to requested instructions refused, do not appear to be meritorious.

Potter, Chief Justice.

Frank Harris was convicted of the crime of grand larceny in the district court sitting in and for Goshen County, upon an information charging him with stealing one head of neat cattle of the value of $35, the property of Curtis E. Griffin. A motion for new trial was duly filed and overruled, the ruling thereon excepted to, and the case is here on error.

1. A preliminary question is raised upon exceptions to the proceedings and order of the district court amending

the bill of exceptions after the term at which it was allowed and signed, and after it had been filed in this court. The bill was ordered returned to the district court, on the application of the Attorney General, for the purpose of allowing a motion to amend it to be made and heard in that court, but, following our usual practice when granting such an application, without then finally deciding as to the sufficiency of the showing to authorize the proposed amendment. (See Stockgrowers' Bank of Wheatland v. Gray, 144 Pac. 294.) Upon a hearing in the district court an order was entered amending the bill so as to correct what is claimed to have been a mere clerical mistake in transcribing from the notes of the official court reporter parts of the testimony describing a certain brand as observed on the animal alleged to have been stolen, or as used by the alleged owner of such animal to mark and identify his cattle, and other parts referring by name or description to that brand. It was sought by the prosecution to prove the larceny by testimony describing the brand on an animal—a two-year-old steer—observed at one time in the defendant's pasture and afterwards in his immediate possession, together with evidence as to the ownership of the brand. This brand was referred to by description several times in the testimony, either in a question propounded to a witness or in his answer. And at every place but one in the official typewritten transcript of the testimony incorporated in the bill, where the brand appears to have been mentioned by name or description, it was designated as N—X—N. The single exception was in transcribing the answer of the witness Curtis E. Griffin, Jr., to the question, "What brand do you use?" That answer appeared in such transcript as "X—N—X."

Such a delineation of a brand would usually indicate the use of a horizontal line or mark between the letters as a part of the brand, for it is a matter of common knowledge in this state that such a mark forms a part of many cattle brands. and is generally spoken of or referred to in that connection as a "bar." Hence the ordinary verbal description of the brands set out in the transcript as above would

be, respectively: N bar X̄ bar N, and X bar N bar X. But the brand owned by Curtis E. Griffin, Jr., who the prosecution claimed was the owner of the alleged stolen animal, was shown by the record proof to be NXN, without any mark or character between the letters. This discrepancy in the evidence as shown by the bill was pointed out in the brief of plaintiff in error and urged as a ground for the contention that the evidence was insufficient to sustain the verdict. Thereupon the application was made to withdraw the bill for the purpose of amendment, it being alleged in support thereof that the use of a "dash" separating the letters of the brand was an error in transcribing the reporter's notes and misrepresented the testimony describing or mentioning the brand. On the hearing of the motion to amend the bill in the district court the official court reporter was sworn as a witness and permitted to produce and explain his shorthand notes of the trial respecting such brand, over the objection of defendant's counsel, and upon comparing the transcript aforesaid with his notes he testified in substance that where X—N—X appeared in the transcript as the answer of Curtis E. Griffin, Jr., to the question, "What brand do you use?" it was a typographical error, for his notes show that answer to have been NXN, and that at every other place in the transcript where N—X—N appeared his notes showed NXN; that by his system of reporting, the letter N is indicated by a short horizontal line and the letter X the same as ordinarily written; that in noting a brand containing a "bar" separating letters he usually wrote out the letters as in "long-hand" with a "bar" between them, but that in this case he had NXN in shorthand, without any character showing a "bar." The shorthand notes were admitted in evidence over defendant's objection, showing that in the several places referred to the notation of the brand was —X—, indicating, as explained by him, NXN. He explained the error in the transcript by stating that he had dictated from his notes by using an Edison Business Phonograph, from which they were transcribed by an assistant, who erroneously "placed a dash

between the letters presumably to separate" them. An or-
der was entered amending the bill by substituting NXN for
X—N—X in the one place aforesaid where that designation
of the brand appeared, and for N—X—N in the other
places where the brand was transcribed in that form.

No evidence was offered to dispute the showing made by
the reporter's notes or his explanation thereof, but the ad-
mission of the evidence was objected to as incompetent and
inadmissible for the reason that the notes were not a part
of the record in the cause nor proper to be consulted in con-
sidering the motion to amend, and further that the proposed
amendment substantially changed the defense by a change
in the substance of the testimony as shown by the bill. And
it is here contended that the reporter's notes do not con-
stitute a proper record, minute or memorandum upon which
to base an amendment to a bill of exceptions. Such notes
are held in Illinois to constitute data upon which the court
may act, unless the reporter is not required by law to take
notes of the particular matter to which the proposed amend-
ment relates. (Chicago, M. & St. P. Ry. Co. v. Walsh, 150
Ill. 607, 37 N. E. 1001; Sullivan v. Eddy, 154 Ill. 199, 40
N. E. 482; Hubbard v. People, 197 Ill. 15, 63 N. E. 1076;
Central Sch. Supply House v. Hirschy, 106 Ill. App. 258.)
And in Missouri, where the stenographer's notes of the trial
filed with the clerk were held to fall short of supplying the
facts to justify the amendment, the right to refer to them
for the purpose does not seem to have been questioned.
(Jackson v. Fulton, 87 Mo. App. 228.) In this state the
stenographic notes of the reporter are not required to be
filed with the papers in the case or in the clerk's office, and
we suppose they are not usually, if ever, so filed; but the
reporter, who is a regularly appointed and sworn officer of
the court under the statute with the title of "official court
reporter" (Comp. Stat. 1910, Secs. 940-948) is required to
"remain in attendance on the court, and take full steno-
graphic notes in cases tried during said attendance, of all
testimony or admissions made by either side, objections to
the introduction of testimony, the ruling of the court there-

on, the exceptions taken thereto, and such other proceedings as the court may direct," and also to preserve said stenographic notes and furnish a transcript thereof to any person having an interest therein, upon payment of the prescribed fees. (Sec. 942.) It is further declared that he shall be the clerk and stenographer of the judge. (Secs. 942, 945.) And that all transcripts of evidence and proceedings written out and certified to by the reporter shall be received as prima facie evidence of the facts, testimony and proceedings set forth in the transcript, when there is attached thereto a certificate of the clerk of the court that the person certifying to the transcript is the official reporter of said court. (Sec. 944.)

In view of these statutory provisions the ground, if any, upon which it might properly be held that the notes of the reporter constitute sufficient data in themselves, or when explained by the reporter, to authorize the amendment of a bill, would, no doubt, be that they stand in the place of the notes or memoranda formerly made by the judge during a trial as an aid to his recollection, and, therefore, entitled to the same consideration for the purpose of amending a record of the proceedings. That seems to be the ground upon which the reporter's notes are held proper to be consulted for such purpose in Illinois, as explained in the case of Railway Co. v. Walsh, *supra*. In that case it is said that the keeping of minutes of the proceedings by the trial judge has largely fallen into disuse, for the reason that the more accurate and reliable mode had been adopted of keeping full stenographic notes of what occurs on the trial by a sworn officer charged with the special duty of making such notes and true transcripts thereof, which, while not conclusive upon the court, are presumed to be correct until questioned and the contrary is made to appear, and are ordinarily accepted and acted upon as the most reliable means of information attainable: and that, "the rule permitting the same judge, at a subsequent term of the court, to amend the record by notes or memoranda made by himself during the trial, applies with equal, if not greater, force to the

transcript of the evidence thus made and preserved," that "every element of accuracy and certitude in the one is inherent in the other, while there is added, in the stenographic notes, fullness and completeness of detail impossible of attainment in memoranda kept by the judge."

In that case the transcript of the notes was consulted and upon the recitals thereof a bill of exceptions was amended so as to show that it contained all the evidence offered or introduced in the case. But we find it unnecessary in this case to determine whether or not the official reporter's stenographic notes are alone sufficient to authorize a bill to be amended with respect to testimony claimed to have been inaccurately transcribed and inserted in the bill, or whether such notes may be alone relied on as authority for amending a bill in any other particular. We perceive no reasonable objection, upon a motion to amend a bill, to a consideration of the notes with the sworn testimony of the reporter explaining the same, in connection with other corroborative evidence found in the record itself; and there is evidence in the bill itself in this case, upon which the court might have acted, and we may assume that it acted at least in part, which, in our opinion, not only corroborates the notes as explained and read by the reporter in giving his testimony, but would be sufficient to justify the order amending the bill. It appears in the transcript of the testimony as incorporated in the bill that counsel for the prosecution offered in evidence the "Official Brand Book of the State of Wyoming" appearing to have been published in 1913, and issued by the State Board of Live Stock Commissioners to show all the brands on cattle, horses, mules, asses, and sheep, recorded up to October 11, 1912, under the provisions of the act approved February 18, 1909, and particularly page 76 of said book "showing the brand N—X—N to be in the name of C. E. Griffin, Jr.," which book was apparently admitted, for the transcript recites, after it had been identified by a witness, over defendant's objection, that the book was then marked as "Prosecution's Exhibit 'A,' and is hereto attached and made a part hereof."

Following that offer, as shown by the transcript in the bill immediately following the above recital as to the brand book, the prosecution offered in evidence a certificate of the secretary of the State Board of Live Stock Commissioners under the seal of the board, "certifying that the brand N—X—N is the property of C. E. Griffin, Jr.," and the same was admitted over defendant's objection.    But in both the book and certificate the brand as printed and published in the one and certified to in the other is NXN.   It is hardly conceivable that in offering this documentary evidence of the ownership of the NXN brand counsel would have orally referred to it as N bar X bar N, or that either the book or certificate would have been admitted in evidence if not corresponding as to the brand with that described in the testimony identifying the animal alleged to have been stolen, and it would not be an unreasonable deduction from the discrepancy respecting the brand between the recital of the offer and the evidence referred to that the line between the letters was not intended to represent a "bar" as part of the brand mentioned by counsel, but merely as a dash to separate the letters which had been named as composing the brand.   Hence this part of the transcript strongly tends to explain what was intended by the "dash" in the other places in the transcript in connection with the same letters when showing the brand testified or referred to.

An equally strong indication of the error in the transcript in this respect is shown by the motion for new trial filed by the defendant, wherein it is alleged that the court erred in admitting in evidence the said certificate of the secretary of the Board of Live Stock Commissioners, "certifying that the brand N—X—N is the property of C. E. Griffin, Jr." This is clearly a mistake as to the brand certified to, if, as contended, a brand so represented is to be read and understood as N bar X bar N.   This is not all. The instructions given to the jury and signed by the trial judge, who, it may be said in passing, also presided at the hearing on the motion to amend the bill, contain references

to the brand showing what the court then understood it to be as stated by the witnesses describing it, or referred to in the testimony. In one instruction (No. 9) the following appears: "If, therefore, you find * * * * that the defendant did take or drive away the steer of Curtis E. Griffin, branded NXN, with intent to steal the same," etc., and in another (No. 10) appears the following:

"Proof has been offered that Curtis E. Griffin was the owner of the brand NXN and that the adoption and use thereof was during the time covered in the information. * * * * If you find that the steer in question was branded NXN, then the said Curtis E. Griffin was prima facie the owner of said animal."

There was no evidence of any other brand on the particular animal than the one mentioned in that instruction, unless the testimony as originally transcribed and found in the bill is to be taken as showing the brand to have been described as N bar X bar N. The defendant testified that there was no brand on the animal sought to be identified by the prosecution as the one seen in his possession and claimed to belong to the said Griffin. Also, in instruction No. 14 it was said that the word "Junior" is no part of the name of the person, but is used merely as matter of description, and "that the omission thereof in the information, in alleging the ownership of the one head of neat cattle, branded NXN, to be in Curtis E. Griffin instead of Curtis E. Griffin, Jr., is immaterial."

There are also references to this brand in the testimony, as shown by the bill, which disclose that the brand mentioned must have been NXN. For example, on the direct examination of Curtis E. Griffin, Jr., the first witness called by the prosecution, he was asked as above stated, "What brand do you use?" The answer was transcribed in the bill as "X—N—X." On his cross-examination he was asked this question: 'Now, who is the owner of this N—X—N brand?" This question was clearly intended to refer to the brand which the witness had testified was used by him, and it tends, at least, to show that his answer describing the

brand used by him was mistakenly transcribed as above, and, with the answer thereto and the next two succeeding questions and answers shows that the registered brand NXN was the one referred to. The answer to the question as to the ownership of the brand was, "Curtis E. Griffin, Jr." Then follow these questions and answers:

"Q. It is registered in that name? A. Yes, sir. Q. And it is known all over the country as being owned by you as Curtis E. Griffin, Jr., that brand? A. Yes, sir."

It does not appear that any brand except NXN was registered in the name of said witness. We think it must be held that the bill was properly amended.

2. As authorized by statute, the prosecution sought to identify the animal alleged to have been stolen by the brand thereon and to prove ownership by showing the ownership of such brand. The statute (Comp. Stat. 1910, Sec. 6177) declares that proof of the brand thereon shall be deemed sufficient to identify all classes of live stock, and proof of the ownership of such brand shall be prima facie evidence of the ownership of such live stock. And by the act of 1913 (Laws 1913, Ch. 126) amending Section 2602, Compiled Statutes, a certified copy of a recorded brand issued by the secretary of the State Board of Live Stock Commissioners is made admissible as prima facie evidence of the ownership of an animal bearing such brand, and it is declared that such certificate shall be taken as evidence of ownership in all suits at law or in equity, or in any criminal proceedings, when the title to the animal is involved, or proper to be proved, when such claim is sustained and corroborated by other evidence. And such a certificate was introduced in evidence showing that Curtis E. Griffin, Jr., was the owner of the brand on the animal identified thereby by the witnesses produced by the prosecution for that purpose. But Curtis E. Griffin having been named in the information as the owner, it is contended that the proof of ownership in Curtis E. Griffin, Jr., constituted a fatal variance, and that the court erred in giving the fourteenth instruction, above referred to, stating in substance that the

word "Junior" is no part of the name of a person, that its omission in alleging the name of the owner was immaterial, and that the information sufficiently alleged ownership in the person generally known as Curtis E. Griffin, Jr.

It appeared that there were two persons named Curtis E Griffin, uncle and nephew, who each owned cattle ranging in the same locality; the cattle of the elder Griffin being branded UB and those of his nephew NXN. That the nephew had lived with his uncle after his father's death, which occurred fourteen years before the time of the trial, and the uncle had been his guardian until he became of age and after that looked after his business, because, as the uncle testified, he was incapable of doing so himself. That the nephew usually affixed "Junior," or its abbreviation, to his name to distinguish him from his uncle, and that he signed papers and was generally known by that name.

It is a well settled rule that the addition of "Junior" to a name is a mere matter of description and constitutes no part of the name; and it is generally held that no material variance results where a name is averred in an indictment or information with such addition and the name is given in the proof without it, or where the averment is without the addition and it appears in the proof that the person signs his name and is known with it. (State v. Weare, 38 N. H. 314; Allen v. State, 52 Ind. 486; State v. Dankwardt, 107 Ia. 704, 77 N. W. 495; State v. Best, 108 N. C. 747, 12 S. E. 907.) But counsel for plaintiff in error, in support of his contention, cites the case of State v. Vittum, 9 N. H. 519, wherein it was held that on the trial of a woman charged with having committed adultery with one Levi Wallace, evidence showing that she had committed adultery with Levi Wallace, Jr., was inadmissible, it appearing that there were in the town where the crime was alleged to have been committed two persons of the same name, father and son, and that the latter used the addition of "Jr." to his name to distinguish him from his father. The court, in that case, based its conclusion upon the general presumption that when father and son, or, as has been

held, two persons not father and son, have the same name, the elder is intended by the use of the name without addition. (See 29 Cyc. 268; 1 Whart. Cr. Ev. (10th Ed.), Sec. 100.) But it is universally held that such presumption may be overcome by evidence identifying the younger person as the one intended, and we think a more reasonable view of the matter is found in other cases in conflict with the one cited. It was held in Rex v. Peace, 3 Barn. & Ald. 579, that upon an indictment charging an assault upon the person of Elizabeth Edwards it was sufficient to prove an assault committed upon one bearing that name, although there were two persons of the same name, mother and daughter, and the proof was of an assault upon the daughter. The court said:

"The crime charged in the indictment has been proved. For it is stated, that the defendant committed an assault on Elizabeth Edwards, and that has been proved. It is not absolutely necessary that the indictment should specifically describe the individual on whom the assault was, for otherwise, an indictment would be bad, which charged that the assault was committed on a person to the jurors unknown. The question here is, not whether the party assaulted has been rightly described, but who the party is who is described in the indictment as having been assaulted. Here that is sufficiently proved. The objection, therefore, is not sustainable."

In State v. Grant, 22 Me. 171, an indictment for larceny charged the stealing of a trunk and money, "the property of one Eusebius Emerson of Addison in the County of Washington." The proof was that there were in the town named two persons named Eusebius Emerson, father and son, and that the trunk and money was the property of the son, who usually wrote his name with "Junior" attached to it. The trial court, over the defendant's objection, instructed the jury that junior was no part of a name, and that the son, if his testimony was believed, had such property or interest in the articles stolen as sustained the allegation of ownership. A conviction was sustained. The appellate

court referred to the ordinary presumption and the rule permitting it to be removed by proof, and, after quoting from the opinion in the case of Rex v. Peace, *supra,* said: "Excepting the difference in crimes, that language is applicable to this case." And in Teague v. State, 144 Ala. 42, 40 So. 312, where one was indicted for an assault with intent to murder W. T. Loard, and convicted, it appeared that a father and son of the same name lived in the same community, and that the assault was upon the son. It was held that a motion to quash the indictment on the ground of a variance was properly overruled, and also that the trial court properly refused an instruction to the effect that if the person assaulted was shown to have been W. T. Loard, Jr., and there was another person in the same locality by the name of W. T. Loard, and that the two are father and son, then the defendant should be acquitted.

In Com. v. Parmenter, 101 Mass. 211, an indictment for breaking and entering a building and stealing therefrom certain alleged personal property, named one of the owners of the building as "William Read the second of the name," and one of the owners of the stolen property as "William Read the younger of that name." It appeared in the proof that one of the owners of the building and property was usually called William Read, Jr., but never called "second." It was held that the indictment was sufficient, and that there was no variance; the court saying: "The terms of the description constitute no part of the name, but are used for the mere purpose of designation and distinction." Citing that case and State v. Grant, *supra,* among others, it is said in Bishop's New Criminal Procedure (2nd Ed.), in Section 718, that in alleging the name of the owner of the stolen goods, when charging larceny, an addition to the name is mere surplusage. And the addition of "Esquire" to the name of the alleged owner in an indictment for larceny was held to be mere surplusage, it appearing that the person of the name alleged and who owned the goods was not an esquire or entitled to that rank, and an objection on

the ground of variance was overruled. (Rex v. Ogilvie, 2 Car. & P. 230.)

The fact that the brand was recorded in the name of the nephew with the addition of "Jr." can make no difference, we think, in the application of the general rule, since it is clear that such addition was so used as matter of description to distinguish the owner from the elder Griffin, the uncle, much the same as a designated place of residence or postoffice address might be used for the purpose, if the two persons of the same name are not living together or at the same place. But if a variance should be conceded it could not be held to be a ground for reversal, for the statute provides that any variance between an indictment or information and the evidence, in the name or other description whatever of any person therein named or described, shall not be deemed ground for an acquittal of a defendant, unless the court before which the trial shall be had shall find that such variance is material to the merits of the case or may be prejudicial to the defendant. (Comp. Stat. 1910, Sec. 6166.) And it is said to be the modern rule that a variance in names is not now regarded as material, unless it appears to the court that the jury was misled by it, or some substantial injury is done to the accused, such as that, by reason thereof. he was unable intelligently to make his defense, or he was exposed to the danger of a second trial on the same charge. (1 Whart. Cr. Ev. (10th Edd), Sec. 95.) The trial court did not find the variance, if any, material or prejudicial. The instruction should probably be understood as indicating that the difference between the information and the proof was not regarded as a variance with respect to the name, but it was stated that the omission of the descriptive addition in alleging the owner's name in the indictment was immaterial, and that the allegation was sufficient as an averment of ownership in the person known as Curtis E. Griffin, Jr., which we think equivalent, in effect, to finding that the difference between the averment and the proof was neither material nor prejudicial. And such a finding would be sustained by the record. In

the complaint upon which the plaintiff was given a preliminary examination the animal alleged to have been stolen was described as branded NXN, and there was no attempt on the trial in the district court to identify an animal with a different brand or to show the larceny of an animal belonging to the elder Griffin.

3.   It was shown by the testimony for the prosecution that the range of the cattle of Curtis E. Griffin, Jr., branded as aforesaid, was in Goshen County, in this state; that a certain ranch or pasture in that county, referred to as "Johnson's," was located in that county near the east boundary line of the county and state, and that it was leased and used by the defendant, though it was not shown that he lived upon it; on the contrary, he testified, and the fact is not disputed, that at the time in question he lived with his family, consisting of a wife and six children, in the town of Mitchell, in the State of Nebraska, which, we understand, is situated a few miles—probably 15 miles or thereabouts—east of the Wyoming line, and that he had resided in that vicinity since 1886. And it appears that he kept cattle in the pasture aforesaid, and was there from time to time to look after or gather them. A witness for the prosecution named McCarty, who, it appears, had been employed to look after cattle with certain brands and see that they were not stolen, testified that on November 20, 1912, he saw in said pasture a red steer with a white face, about two years old, and with about an inch of its tail "bobbed or chewed off" and branded NXN. The same witness testified that on January 6, 1913, he saw the defendant driving some cattle near Mitchell, in Nebraska, and put one of them in certain slaughter pens south of that town—a red, white face, muley steer, two years old, brand NXN, and with probably an inch of its tail cut off; that he saw the animal killed the next day by the butcher, and the hide salted and put in a barrel; then went and got another person, who also testified for the prosecution, and, a few hours after the killing of the steer, they took the hide from the barrel. That hide was produced at the trial.

The one who had killed the animal was also a witness for the prosecution, but he testified that he did not notice the brand upon it.   The defendant testified that the animal he delivered at the slaughter house was not branded NXN or with any brand, that it belonged to and had been raised by him, and that on the day stated he brought it with others— in all eight head—from a pasture about four miles from Mitchell.   He also testified that there had not been any NXN cattle in the pasture used by him in Wyoming.

After the testimony had been introduced by the prosecution to identify the animal, tending to show its possession by the defendant, as aforesaid, the prosecution was permitted, over defendant's objection, to introduce testimony to show that he had been arrested and confined in jail in Nebraska before surrendering himself to the authorities of this state for trial.   And it is contended that serious error was committed in the admission of such testimony, and in giving an instruction based upon it.   Proper exceptions were preserved, and we think they must be sustained.   The evidence seems to have been offered and admitted on the theory that it showed resistance or avoidance of arrest on the defendant's part, but, in our opinion, it fails to do so within the meaning and purpose of the rule permitting such fact to be shown.   It appears that a criminal complaint charging this crime was filed with a justice of the peace in Goshen County on January 7, 1913, and that a warrant for defendant's arrest was issued on the same day and delivered to the sheriff of that county.   The warrant was introduced in evidence in connection with the testimony aforesaid and appears to have been endorsed by the sheriff as received by him on January 8, 1913, and returned on January 11, 1913, "not finding said defendant in the County of Goshen nor in the aforesaid state."   And that seems to be the only return upon the warrant.

The sheriff, having been called and sworn as a witness, was asked what he did while armed with the warrant in attempting to arrest the defendant.   Objection was interposed and overruled, and the witness stated that he took

the train and went to Mitchell with the warrant. There-upon the direct examination of the witness proceeded as follows (omitting the stated grounds of objection and the exceptions noted) :

"Q. Did you see Frank Harris there at Mitchell? A. I did. Q. What conversation took place between you and him with reference to this warrant, if any? Objected to. Overruled. A. Well, I don't know as there was any con-versation, but he asked me to let him see the warrant. Q. Did you show it to him? A. I did. Q. I will present you Exhibit 'C,' and ask you if this was the warrant you had with you on that day? A. It is. Q. Is that the warrant which you exhibited to him at his request there? A. Yes, sir. Q. You may state what he said to you, if anything, with reference to his returning to this state to answer this warrant, without requiring you to extradite him from the Sate of Nebraska? Objected to. By the court: Over-ruled. He may state what he said. A. He said he wouldn't come into the State of Wyoming without requisition papers. Q. Where did you finally get the defendant when you did bring him back into the State of Wyoming? A. I got him in jail at Gering, Nebraska. Q. How long was it after he was arrested and refused to come into this state without requisition papers from the Governor of Nebraska, that you were finally able to take him into custody Objected to. By the court: He may answer. A. I think it was about six days. I am not quite sure about the number of days, but I think it was about six days that they were in Gering until I went down and brought them back. Q. What pro-ceedings had you instituted, or caused to be instituted in the meantime looking to the extradition of the defendant? Objected to. Overruled. A. Well, they phoned and said they would come over without extradition papers. Q. Mr. Harris did? A. I think you called me up first from Chey-enne and said they would. (Motion to strike out this an-swer sustained.) Q. What proceedings had been brought in the State of Nebraska? A. I don't know as I know what proceedings. Q. What proceedings were brought be-

fore Judge Quivvy over in Nebraska at Mitchell? Objected to. Overruled. A. They had a trial before Judge Quivvy in Nebraska. Q. State whether or not the defendant was thereafter incarcerated in the county jail at Gering? Objected to. By the court: He may state, if he knows of his own knowledge. A. He was. Q. Did you conduct them to jail yourself? A. I did. Q. You may state whether or not anything was said by you to the defendant with reference to your intention to apply to the Governor of Nebraska for requisition papers? Objected to. Overruled. A. Nothing was said that I know of. Q. Do you know whether Mr. Harris was advised that that was your intention, and that they were being kept in jail pending your application for requisition papers? Objected to. Overruled. A. I think he was advised. Q. How long had the defendant been in jail before you were advised that he would surrender without the formality of requisition papers? Objected to. Overruled. A. About five days."

On cross-examination of said witness it appeared that after the defendant had been put in jail at Gering, which we understand to be the county seat of the Nebraska county in which the town of Mitchell is situated, the witness came back to Torrington, in this state, the county seat of Goshen County, and remained there until he went after the defendant about five days later and brought him to Torrington; and further that on being arrested the defendant attempted to get into communication with an attorney named Wright living at Scotts Bluff, in the same county, but who was found not to be at home, and then an attorney who assisted in his defense—Mr. Morrow—was employed, and the defendant, after remaining in jail at Gering five days, came to Wyoming with the sheriff without a requisition.

The prosecuting attorney was also called as a witness and examined with reference to the defendant having been in jail at Gering, and it appears from his testimony that the defendant was arrested and some kind of a hearing had within a day or two before a magistrate at Mitchell, whereupon the defendant was taken to said jail. The particular

nature of that hearing is not stated or shown, though counsel for the prosecution referred to the matter in questioning the witness as a hearing upon a "fugitive from justice charge." But the papers, if any, upon which the hearing was had, or the warrant, if any, upon which the defendant was arrested, other than the one above mentioned, were not produced or offered in evidence, nor the commitment, if any, upon which he was lodged and kept in jail. We are, therefore, compelled to assume that the arrest in Nebraska referred to was upon the justice's warrant issued in this state, and the defendant so testified. He admitted that he at first refused to come to Wyoming with the sheriff, giving as one of his reasons that he wanted to consult his attorney, and that he took steps to do so is shown also by the sheriff's testimony. He offered additional explanation, but it was excluded by the court. The defendant further testified that his arrest was by the sheriff of the Nebraska county who then turned him over to the sheriff of Goshen County.

The remarkable thing about this testimony is that it does not show any resistance to the arrest on the part of the defendant, or any attempt to evade it, except a refusal when first shown the warrant to come with the sheriff to this state without a requisition; and that was his absolute right, whether guilty or innocent. Nor does it show that extradition was resisted, for it does not appear that any extradition warrant had been obtained or even applied for. Indeed the defendant seems to have expressed, in effect, a willingness to go if requisition papers were obtained. Apparently the defendant was arrested under the warrant issued in this state, given a hearing of some kind, possibly upon a "fugitive from justice charge," and then taken to the jail and kept there several days, all without resistance on his part. But the court instructed the jury as follows:

"If you find beyond a reasonable doubt that the defendant purposely and without good reason attempted to evade or avoid arrest, under a warrant then in the hands of the sheriff of this county, and issued upon a complaint charging the defendant with the commission of larceny charged

against him herein, and that the defendant resisted extradition from the State of Nebraska, such facts, or either of them, so found are proper for you to take into consideration in connection with all the other evidence in the case in arriving at the guilt or innocence of the defendant."

The fact of avoidance of or resistance to arrest, like that of flight, is admissible only on the theory that it may tend to show a consciousness of guilt. Its tendency in that respect may often be slight, and the defendant may always explain such conduct, and the explanation should be submitted to and considered by the jury together with the evidence showing his conduct, in determining its effect. (State v. Baird, 12 Ida. 29, 88 Pac. 233.) It is said that "he court should always carefully instruct upon this class of evidence, and take into consideration any fact that explains or qualifies or limits such circumstances, or shows them in any way to be consistent with innocence." (2 Whart. Cr. Ev. (10th Ed.), Sec. 750.) If the evidence had justified an instruction on the subject we think the one given objectionable in some respects as to form. It seems to submit to the jury the question whether the defendant's reason for avoiding arrest, if he did so, was good and sufficient, rather than whether it reasonably influenced or affected defendant's conduct so as to remove or lessen the effect of such conduct as an indication of a consciousness of guilt. And there is no reference in the instruction to the conditions under which the arrest was made or attempted upon the warrant in the sheriff's hands, or the absence of authority to execute the warrant in the other state where the defendant resided.

But we doubt if evidence has ever been held admissible to show merely that an accused neglected or refused to voluntarily surrender himself to the authorities, and especially an officer of another state, as a circumstance from which guilt may be inferred, or to be considered in .determining the question of guilt. So far as we have been able to ascertain, the admissibility of evidence having that effect only is denied by the authorities. (State v. Jackson, 95

Mo. 623, 642, 652, 8 S. W. 749; State v. Martin, 229 Mo. 620, 129 S. W. 881, Ann. Cas. 1912A, 908; State v. Evans, 138 Mo. 116, 127, 39 S. W. 462, 60 Am. St. Rep. 549; State v. Hopper, 142 Mo. 478, 482, 44 S. W. 272; Russell v. State, 37 Tex. Cr. Rep. 314, 39 S. W. 674.) That is the most that this testimony shows as to defendant's conduct in connection with the arrest or his confinement in jail. In Russel v. State, *supra,* a conviction was reversed because of error in an instruction with reference to defendant's refusal to submit to an attempt to arrest him without a warrant; and the court said: "The court should have instructed the jury that said arrest was illegal, and that if they believed appellant resisted the same simply because it was illegal, that they would not consider such resistance as a circumstance against him, but if, on the other hand, they believed the defendant resisted said arrest, but did not do so merely because it was an illegal arrest, then they might consider the circumstance of his resistance, in connection with the other facts and circumstances in evidence, etc." And again: "If the arrest was illegal, although the defendant might know what he was being arrested for, still he was not required to submit to it, and might resist without it being a criminative fact against him." In State v. Jackson, *supra,* testimony was admitted showing that the defendant was extradited from another state, but it appeared that he had not denied his identity. The court held that the objection to the testimony should have prevailed, and said: "The mere fact that he (defendant) did not take an active part in facilitating his transportation to a distant state afforded no ground for unfavorable presumptions against him, or tended in the least to shed any light on the charge on which he was tried. Its only tendency was to prejudice the jury against him, and should not have been admitted." In State v. Evans, *supra,* the court said: "The instruction on the presumption of flight ought not to have been given without more evidence of flight. The mere fact that defendant was arrested in Arizona was not sufficient of itself to be the basis of the instruction."

The fact that defendant was lodged and confined in jail was particularly emphasized in the testimony, and the purpose evidently was to convey the impression that it was necessary to imprison the defendant several days before he would consent to his removal to this state. It may or·may not have been necessary. But by proper proceedings he might, no doubt, have been legally so restrained until an extradition warrant could be obtained for his removal. An accused, unable after his arrest to furnish bail, is usually confined in jail to secure his attendance at the trial. Yet such fact is not supposed proper to be shown as incriminating evidence against him. And the imprisonment in this case upon the facts disclosed, could have been lawful and proper only for the purpose of detaining the defendant pending proceedings for his extradition. His arrest and detention for that purpose does not seem to have been resisted or evaded. The fact that defendant insisted that he be arrested and removed lawfully, if at all, ought not to be considered as an incriminating circumstance. Such a position is certainly not inconsistent with innocence. The evidence on this subject should have been excluded when offered, and the entire matter excluded from the consideration of the jury. Its effect could not have been otherwise than prejudicial. The evidence having been admitted, it was error to exclude the offer of defendant to further explain his declining at first to come to the state without requisition papers. Whether the explanation was reasonable or plausible or not was a question for the jury, and it was their province, and not the court's, to determine its probable or reasonable relation to the alleged conduct.

4. Several exceptions were taken to the overruling of objections to questions propounded on behalf of the prosecution, on the ground that they were leading, and it is contended that those rulings were erroneous and prejudicial. While much latitude must be allowed a trial court in permitting the examination of witnesses by questions objected to because leading in form, and the allowance of such questions is not generally to be considered a ground for reversal

unless there appears to have been a clear abuse of discretion, and we would not be inclined to reverse this case on the ground of such rulings, we think it proper to say that the objection to some of the questions should have been sustained, for they related·to a vital fact in the case and were unnecessarily suggestive. For example, it was certainly not necessary to lead the witness McCarty, the detective, upon whose testimony the prosecution strongly relied for a conviction, and we think the following question propounded to that witness was leading and therefore improper: "I ask you if you saw any cattle there branded NXN?" Immediately preceding this question the witness had been asked if he was near the ranch of the defendant in this state about the 20th of November, 1912, and he had answered that he was. Answering the question objected to he gave the testimony previously referred to describing a two-year-old steer that he saw there branded NXN, which was the only testimony tending directly to show that the alleged crime had been committed in this state. Under some circumstances the question might not have been objectionable as leading, but we think it was clearly so in this case.

5. The prosecution produced one C. C. Bridges as a witness, who testified that he resided in Nebraska a mile and a half east of the Wyoming line, and about eight miles from the Wyoming pasture used by the defendant, and that a fence had been built along such line in the neighborhood of his residence provided with gates, which were kept closed except when used to go from one side to the other; that part of the fence had been built by the defendant, and that he had seen him driving cattle through a gate in the fence, the last time being a few days before Thanksgiving in 1912, when he saw him and his brother driving some cattle through a gate in the fence from Wyoming east. He also testified that in 1912 and January, 1913, the fence was in good condition. The questions relating to the existence and condition of the fence were objected to, but no objection was interposed to the questions

with reference to the moving of cattle from one side to the other by the defendant. At the close of the direct examination of the witness counsel for the defendant moved to strike out all of his testimony as irrelevant, immaterial and not responsive to the issues. The motion was overruled and an exception noted. It is contended that the testimony of said witness was irrelevant and improperly admitted. The evident purpose of the testimony was to show, first, the improbability of cattle straying from Wyoming into Nebraska, because of the fence, though the witness testified that he had seen cattle that had strayed into Nebraska, and, second, to show that the defendant was in the habit of driving cattle to and from his Wyoming pasture by using a gate in the fence, and that he had so driven cattle from Wyoming in the latter part of November, 1912. As the witness did not see any of the brands upon the cattle then driven into Nebraska, his testimony as to that particular occasion was, perhaps, not directly relevant, though we do not think it was improper to show the habit or custom of the defendant with reference to driving cattle from Wyoming into Nebraska, in the vicinity of his ranch or pasture. But much of the testimony of the witness was clearly competent, and the motion to strike it all out was, for that reason alone, properly overruled.

6. The following instruction was given and excepted to:

"It is the duty of each juryman, while the jury are deliberating on their verdict, to give careful consideration to the views his fellow jurymen may have to present upon the testimony in the case. He should not shut his ears, and stubbornly stand upon the position he first takes, regardless of what may be said by the other jurymen. It should be the object of all of you to arrive at a common conclusion, and to that end you should deliberate together with calmness. It is your duty to agree upon a verdict, if that is possible."

We perceive no impropriety in the instruction, so far as it goes. though we think it would be preferable to substitute for the word "calmness," or add to it, the word "can-

dor," or a word of similar import, in stating the manner in which the jury should deliberate. But we think it would be better in such an instruction, to avoid possible misunderstanding, to connect with what is there said a statement to the effect that the verdict should finally be the verdict of each individual juror, or express the opinion of each. A similar instruction, so qualified, was approved by the Supreme Court of the United States in Allen v. U. S., 164 U. S. 492, 501, 17 Sup. Ct. 154, 41 L. Ed. 528. After stating the substance of the instruction considered, and citing cases wherein like instructions had been approved, the court said:

"While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself."

Other errors are assigned, but the above are all that we think necessary to consider. For the error in admitting the evidence as to the arrest and imprisonment of the defendant in Nebraska and giving the instruction based thereon the judgment must be reversed and the cause remanded for a new trial, and it will be so ordered.

Beard, J., and Scott, J., concur.