THE STATE OF WYOMING,

*Plaintiff and Respondent,*

vs.

LYLE W. HOLM, JR.,

*Defendant and Appellant.*

(No. 2461; November 21, 1950; 224 Pac. (2d) 500)

362

364

For the defendant and appellant the cause was submitted upon the brief of Jerry W. Housel and Goppert & Fitzstephens, all of Cody, Wyoming, and oral argument by Mr. Ernest J. Goppert.

For the plaintiff and respondent, the cause was submitted upon the brief of Norman B. Gray, Attorney General, Marion H. Smyser, Deputy Attorney General and Harry A. Thompson, Assistant Attorney General, all of Cheyenne, Wyoming, and oral argument by Mr. Smyser.

## OPINION

BLUME, Justice.

    The defendant Lyle W. Holm, Jr., about 19 years of

age, was convicted of statutory rape of Leona Evelyn Lovercheck, a girl of the age of approximately 14 years. He was sentenced to be confined in the industrial institute near Worland, Wyoming for a period not to exceed five years. From the conviction and sentence the defendant has appealed to this court.

It appears herein that on the evening of July 28, 1948, a little after 11 o'clock at night the prosecutrix, who had been working in a theater, was on her way home at Powell, Wyoming. She was picked up in an automobile by three boys, namely, Lawrence Boyle, Jack Cruggs, and the defendant, all of approximately 19 years of age, near a school house at Powell, while she was thus on her way home. Lawrence Boyle was driving the automobile. The testimony is conflicting whether she voluntarily or involuntarily entered the automobile. In any event the boys and the girl drove to Garland, Wyoming, distant about 7 miles northeast of Powell, then turned a short distance to the west and stopped. According to the testimony of the state all of the boys including the defendant had sexual intercourse with the prosecutrix, first Jack Cruggs, then the defendant and then Lawrence Boyle. They returned to Powell and took the prosecutrix home. After she arrived home she was lying in her bed and crying and made complaint of the attack upon her to her sister, mother and father, and a physician was called in to examine her that night. The boys, including the defendant, were arrested and put in jail the next day. Jack Cruggs and Lawrence Boyle were arraigned before Honorable Percy W. Metz, Judge of the District Court of the Fifth Judicial District, on August 4, 1948 and were interrogated by the judge. They pleaded guilty to the charge of rape of the prosecutrix and were sentenced to the industrial institute at Worland. The defendant refused to plead guilty, entered a plea of not guilty and was tried at Cody, Wyoming in March, 1949. The defendant and a young

lady of Powell were engaged to be married on August 1, 1948, but at that time defendant was in jail but they were married in September, 1948. Various matters are assigned as error in this case.

1. (a) The mother of the prosecutrix herein testified that the latter told her on the night of July 28, 1948, that "three boys had taken her out." This testimony was objected to but the objection was overruled and this is assigned as error herein. In State vs. Mau, 41 Wyo. 365, 285 P. 992, this court approved of the prevailing rule to the effect that while it may be permitted to be shown that the prosecutrix, in a case of rape, made a complaint immediately or soon after the alleged attack, details may not be shown under examination by the state. We are inclined to believe that the testimony related to a detail of the offense and the testimony should have been stricken. But it does not follow that the error was prejudicial. Jump vs. State, 146 Neb. 501, 20 N. W. 2d 375, State vs. McLemore, 99 Kan. 777, 164 P. 161. The evidence in this case is unanimous, including the testimony of the defendant himself, that three boys actually took out the complainant on the evening of July 28, 1948, the time of the alleged offense herein. So we cannot see how the error of the court could have been prejudicial.

(b) Complaint is also made that the mother of the prosecutrix was permitted to testify concerning the complaint of the latter before the prosecutrix herself had testified. It is true that the order of testimony was improper for the testimony of the mother would have been incompetent and immaterial if the prosecutrix herself had not testified. State vs. Mau, supra. Thus it is said by IV Wigmore on Evidence (3rd Ed.) Sec. 1136, page 226 as follows: "Since the only object of the evidence is to repel the supposed inconsistency between the woman's present testimony and her former silence,

it is obvious that if she has not testified at all, there is no inconsistency to repel, and therefore the evidence is irrelevant." In this case, however, the prosecutrix testified and so the order of introduction of evidence cannot be held to be prejudicial herein.

2. The prosecutrix testified that she told her sister during the night of July 28, 1948, that she had been raped "and told her by whom it was." Counsel for the defendant moved that the latter part of the answer be stricken and that the jury be instructed to disregard "by whom it was." The court overruled the objection. The cases are not uniform in their holdings as to whether or not the name of the person who is charged to have committed the offense of rape may be shown in connection with the complaint made by the prosecutrix. Thus it is held that it is not error if the name of the defendant is mentioned. Younger vs. State, 80 Neb. 201, 114 N. W. 170, State vs. Andrews, 130 Ia. 609, 105 N. W. 215. Most cases, however, that have passed on the question consider that the naming of the defendant is part of the details and so cannot be shown. Hall vs. State, 248 Ala. 33, 26 So. 2d 566, Lee vs. State, 246 Ala. 69, 18 So. 2d 706, Creswell vs. State, 61 Ga. App. 828, 7 S. E. 2d 788, State vs. Daugherty, 63 Kan, 473, 65 P. 695, State vs. Griffin, 43 Wash. 591, 86 P. 951, State vs. Tellay, 100 Utah 25, 110 P. 2d 342, People vs. Huston, 21 Cal. 2d 690, 134 P. 2d 758. If, accordingly, the testimony of the prosecutrix is equivalent to naming the defendant, the order to strike should probably have been sustained. But the testimony did not go quite that far. It would seem that taking the testimony as a whole, it means hardly anything more than that someone raped the prosecutrix and in view of that fact, we do not think that the error, if any, was prejudicial.

3. It is claimed by counsel for the defendant that the complaint made by the prosecutrix was not voluntary

but was made in response to inquiries. The testimony shows that during the night of July 28, 1948, after the prosecutrix had returned home, she cried and her sister asked her what was the matter, and the complaint made by the prosecutrix was made pursuant to that inquiry. That was true also in connection with the complaint made by the prosecutrix to her mother. The question is: Was the complaint voluntary and spontaneous? In a note to Section 1761, VI Wigmore on Evidence, the author thinks that the weeping in a case of this sort is an effective complaint which led to the question and that under such circumstances, the complaint should not be considered to be involuntary. And that is the holding in Commonwealth vs. Ellis, 319 Mass. 627, 67 N. E. 2d 234, State vs. Pearson, 49 R. I. 386, 143 Atl. 413, King vs. Osborne, 1 K. B. (1905) 551, 556, King vs. Norcott, 1 K. B. (1917) 347. In Commonwealth vs. Ellis, supra, the court said in part: "The statements did not cease to be voluntary merely because they may have been given, in part at least, in response to questions, which were not shown to be of a suggestive or leading character." The court in King vs. Osborne, supra, said on this subject: "It appears to us that the mere fact that the statement is made in answer to a question in such cases is not of itself sufficient to make it inadmissible as a complaint. Questions of a suggestive or leading character will, indeed, have that effect, and will render it inadmissible; but a question such as this, put by the mother or other person, 'What is the matter?' or 'Why are you crying?' will not do so. These are natural questions which a person in charge will be likely to put; on the other hand, if she were asked, 'Did So-and-so' * * * 'assault you?' 'Did he do this and that to you?' then the result would be different, and the statement ought to be rejected. In each case the decision on the character of the question put, as well as other circumstances, such as the relationship of the

questioner to the complainant, must be left to the discretion of the presiding judge. If the circumstances indicate that but for the questioning there probably would have been no voluntary complaint, the answer is inadmissible. If the question merely anticipates a statement which the complainant was about to make, it is not rendered inadmissible by the fact that the questioner happens to speak first." The above objection must accordingly be overruled.

4. (a) Complaint is made that the mother of the prosecutrix was permitted to testify that the doctor who attended the prosecutrix on the night of July 28, 1948, advised that the prosecutrix be given a douche, and that this douche was in fact given. To give the prosecutrix a douche under the circumstances appearing in this case was a matter that would be done in the natural course of events. We are unable to see any particular prejudice resulting from the testimony.

(b) Complaint is also made of the testimony of one Paul M. Kopriva who lived in the neighborhood of the place at Powell at which the prosecutrix got into the automobile driven by the witness Boyle. He testified that about 11:15 P.M. of the evening of July 28, 1948, which was approximately the time at which the prosecutrix entered the automobile, he heard some girl or some female cry "help, help." The prosecutrix testified that she screamed. The witness Kopriva may have interpreted the scream as meaning "help, help." Two witnesses for the defendant who were neighbors of Kopriva testified that they heard no screaming and no cry for help. We are not altogether certain that the testimony of Kopriva should have been admitted. However, it related merely to the fact as to whether or not the prosecutrix got into the automobile voluntarily or against her wishes. That was a comparatively immaterial matter in this case. The crime charged herein

took place, if it took place at all, near Garland which is distant some seven miles northeast of Powell. It was immaterial herein whether the prosecutrix was forced to have sexual intercourse with the defendant or whether she voluntarily consented thereto in view of the fact that she was under 18 years of age.

5. (a) Counsel for appellant complain of misconduct of the prosecuting attorney in asking certain questions and bringing out, or attempting to bring out, certain facts which were improper. Among other authorities they call our attention to Annotation 109 A. R. L. 1089 where it is stated that reversals have frequently been granted in case of such misconduct. The reason for such holding is stated on page 1096 of the annotation to the effect that the administration of law is not a game in which the victory belongs to him who is most ingenious in turning the existing rules to his advantage. However, it is stated on page 1091 of the annotation as follows: "The answer to the inquiry whether, in the examination of witnesses before a jury, the asking of improper questions, is cause for reversal, depends, of course, upon the nature of the questions and the circumstances of the particular case. While the decisions are not in entire harmony in the statement of general rules and presumptions, they form a somewhat harmonious pattern when viewed with reference to the various circumstances ruled upon. The vital inquiry usually is whether or not the verdict was substantially influenced by the improper questions."

We shall examine some of the objections raised herein in the light of the rule thus stated. Jack Cruggs and Lawrence Boyle, associates of the defendant, on the evening of July 28, 1948, were witnesses for the defendant. They testified substantially to the effect that the prosecutrix joined them, in the car which Boyle was driving, voluntarily. On cross-examination they

were asked whether or not at the time when they appeared before Judge Metz on August 4, 1948, they did not state, substantially, that the defendant was one of the parties who put the prosecutrix into the car, somewhat at least against her wishes. They answered substantially to the effect that they did not remember having so stated to Judge Metz. Counsel for appellant now complain that these impeaching questions were not followed up by proof that the statements which they were assumed to have made to Judge Metz, were actually made. A number of cases are cited that not to do so is error. State vs. Bush, 50 Ida. 166, 295 P. 432, Thurmond vs. State, 57 Okl. Cr. 388, 48 P. 2d 845, Hash vs. State, 48 Ariz. 43, 59 P. 2d 305. However, we find in the record the following stipulation: " 'It is stipulated between counsel for the plaintiff and defendant, that both the witnesses Lawrence Boyle and Jack Cruggs made some statements at the time of their arraignment, before Judge Metz on August 4, 1948, which are different, and not the same as the statements testified to by them in this case.' " It would seem accordingly that the prosecuting attorney was prepared to show that the contradictory statements mentioned by him were in fact made by the witnesses before Judge Metz on the date mentioned. We can conceive of no other purpose of the stipulation than the waiver by the defendant of the necessity for the prosecuting attorney to show these contradictory statements. So we can see no error in this connection. The questions, whether or not such contradictory statements were made before Judge Metz were clearly impeaching questions, were contradictory to the statements made by the witnesses on direct examination, and we are unable to see that they were questions that were improper.

(b) When the witness Jack Cruggs was cross-examined, the prosecuting attorney asked him "and did the Judge not say"—here proceeding to relate at length

what Judge Metz was supposed to have told the witness at that time. We are unable to see the materiality of that. It was not an impeaching question. Neither do we see that it was particularly prejudicial to the defendant.

(c) The witness Jack Cruggs on cross-examination stated that he thought he got a "bum rap for rape," on account of the fact that he had been promised a parole by the prosecuting attorney and that the latter failed to ask for it. Thereafter the latter asked the question: "There is another reason why you feel you got a bum rap, the fact that you are incarcerated in jail and Mr. Holms isn't." Counsel for the defendant thereupon demanded that the prosecuting attorney be admonished on "those kind of cracks." The court stated that that was cross-examination and that the prosecuting attorney had a right to ask how he got a "bum rap," but sustained the objection as to the latter part of the question and ordered it to go out. Error is assigned on account of this question. It is true as counsel claim and as this court has a number of times indicated, (see State vs. Sorrentino, 31 Wyo. 129, 144, 224 P. 420) that a prosecuting attorney must see that the defendant has a fair trial and that if he fails to do so, a new trial may be ordered by this court. We agree with the rule stated in 42 Am. Juris. 255-256, cited to us. It is readily seen, however, that the witness cast a reflection upon the honesty of the prosecuting attorney in this case and so we are not prepared to say that the latter went out of bounds in connection with the question which he asked.

(d) When the defendant was examined he testified that he had no sexual intercourse until after the time of his marriage. The prosecuting attorney thereupon perhaps dramatically asked: "Was the defendant sworn in this case?" Defendant had in fact been sworn, as the prosecutor must have known. Counsel for the defendant

objected and moved that the prosecuting attorney be admonished not to ask such questions. The court overruled the objection. We think that a prosecuting attorney should abstain from gestures which dramatically cast a reflection upon a witness, and thereby insinuate that he is not telling the truth. We must, however, bear in mind the fact that he had the right in his closing argument to question the veracity of the witness. Matters of this kind should, to a large extent, remain in the control of the presiding judge. We cannot say that a new trial should be ordered in this case on account of the above mentioned matter.

6. The court in Instruction No. 3 told the jury as follows: "The court instructs the jury that the material allegations in the information against the defendant in this case are as follows: (1) That Leona Evelyn Lovercheck is under the age of 18 years; (2) That the defendant Lyle W. Holm, Jr., did unlawfully have sexual intercourse with the said Leona Evelyn Lovercheck in Park County, Wyoming, on or about the 29th day of July, 1948." It is claimed by the defendant that this instruction is defective on account of the fact that it did not require that the defendant and the prosecutrix were not married. It is stated in 44 Am. Juris. 934, Section 59: "In an indictment for rape or assault with intent to rape, or for carnal abuse of a female under the age of consent by rape or assault with intent to rape, it is not necessary, as a general rule, to allege that the prosecutrix was not the wife of the accused. Such a fact, if it exists, is generally held to be a matter of defense." We think that this is the correct rule, and so should be extended to an instruction. It is further claimed that the instruction is defective in not alleging that it was feloniously done. In 44 Am. Juris. 934, Section 58, it is stated: "The statutory offense of carnally knowing and abusing a child under the age of consent is sufficiently alleged in the words of the statute without

stating that it was 'feloniously done.'" Section 9-217, Wyo. Comp. St. 1945, states as follows: "Whoever unlawfully has carnal knowledge of a woman forcibly and against her will, or of a woman or female child under the age of eighteen (18) years, either with or without her consent, is guilty of rape." The instruction was in accordance with the language of the statute and we see no error in giving it.

7. Defendant asked the court to give Instruction No. "B" reading as following: "The court instructs you that the presumption of innocence that the law throws around the defendant on trial, is not mere form, but is an essential and substantial part of the law of the land and binding on the jury in this case, and it is the duty of the jury to give the defendant the full benefit of this legal presumption of innocence, and to find him not guilty, unless the state shall satify you beyond all reasonable doubt and by competent evidence of his guilt in manner and form as charged." The court refused to give this instruction and this is charged as error. We think, however, that while the asked instruction appears to be correct, the court substantially charged the jury as asked therein. Thus the court in Instruction No. 6 stated as follows: "The court instructs the jury the information in this case is only a formal charge and is not to be considered any evidence of guilt on the part of the defendant. Nothing is to be taken by implication against him; the law raises no presumption against him. Every presumption of law is in favor of his innocence, and in order to convict him of the crime charged against him, every fact necessary to constitute such crime must be proven by the state, to your satisfaction and beyond a reasonable doubt; and if you entertain a reasonable doubt upon any single fact or element necessary to constitute the crime, it is your duty to give him the benefit of such doubt and find him not guilty." In Instruction No. 7 the court stated as

follows: "The court instructs the jury that in this case the defendant is accused of an offense of which he is presumed to be innocent, and that the defendant is clothed with this presumption of innocence throughout the trial and until after a careful consideration of all of the evidence you are satisfied beyond a reasonable doubt of his guilt. If you have a reasonable doubt of the defendant's guilt, it is your duty to find him not guilty. If, on the other hand, you have no such doubt, but are persuaded of his guilt beyond a reasonable doubt, it is your duty to find him guilty.

8. The defendant asked the court to give Instruction "H" reading as follows: "You are instructed that in this case the prosecution relies for conviction upon the testimony of Leona Lovercheck, the prosecuting witness, and no other witness was called by the state to testify directly to the time and place or circumstances of the alleged offense, and you are instructed in cases where the state relies upon the uncorroborated testimony of the prosecutrix, unsupported by other evidence, that you should view such testimony with great caution." The instruction asked is in the exact language of the instruction asked and considered in the case of Strand vs. State, 36 Wyo. 78, 252 P. 1030. In that case we refused to reverse the case on the ground that the instruction was not given. We think that more reason than in that case exists in the case at bar for refusal to give the asked instruction. The court by Instruction No. 8 told the jury as follows: "You are instructed the charge of rape is likely to create a strong prejudice against an accused. It is a charge easy to make, and hard to disprove. Thus you should bear in mind this difficulty of defending against such a charge and consider carefully all the evidence and instructions of the court." Again in Instruction No. 9, the court told the jury as follows: "The court has instructed the jury that from the peculiar character of rape, care should be used

by them in considering the evidence for the prosecution. The female claiming injury is a competent witness in such cases, but the degree of credit to be given to her testimony depends more or less upon the concurrence of the circumstances and facts proved at the trial in support of her testimony." Thus it is seen that the court came very close to giving the instruction which was asked.

Furthermore, we think that the evidence of the prosecutrix was, to some extent at least, corroborated by the defendant's own witnesses. Lawrence Boyle and Jack Cruggs who were witnesses for the defendant testified that while two of the boys were back of their automobile while stopping near Garland, one of the boys was in or near the car. It seems that Jack Cruggs was the first who had sexual intercourse with the prosecutrix. Lawrence Boyle testified in part as follows:

"Q. You were still down there (back of the car) when Jack (Cruggs) returned?
"A. Yes.
"Q. 150 yards away?
"A. 150 feet.
"Q. Then who went up next?
"A. I think Red (the defendant) went up to the car next.
"Q. How long was he up there?
"A. Five, ten or fifteen minutes; I don't know what time.
"Q. Was he inside the car with Leona?
"A. I don't know; I wasn't up there.
"Q. Did he go towards the car?
"A. He went towards the car, yes.
"Q. Anyway, the last you know about it, Red (the defendant) went up towards the car?
"A. Yes.
"Q. In five, ten or fifteen minutes, he came back?
"A. Yes."

382

The witness Jack Cruggs testified as follows:

"Q. Now, the time you were out in the vicinity of Garland, you testified you left the automobile, leaving Leona in the car and walked to the rear of the car. Do you know who walked to the car next?

"A. I believe I have answered that before; I don't know.

"Q. Did someone walk to the car then?

"A. Well, I don't know; someone got in. You mean after I got out?

"Q. Yes.

"A. I don't know whether they did or not. They went up that way. I would say they got in.

"Q. And then a little later, did that party come back?

"A. I believe that is right.

"Q. And then did the other party go to the car?

"A. That makes the third one; there was just three of us.

"Q. Did another party go after that, two parties after you did?

"A. I believe they did; I don't know.

"Q. Would you say both of the other boys went up and spent some time in the car?

"A. Well, I wasn't up there; I don't know, if they were in the car.

"Q. Did they go up towards the car?

"A. They did."

Thus it appears that the situation in this case is very close to the situation as it appeared in the case of State vs. Koch, 64 Wyo. 175, 189 P. 2d 162. We cannot accordingly say that the court erred in failing to give the instruction asked as above mentioned.

9. *PUBLIC TRIAL.* Counsel for appellant assign as error that the defendant was not given a public trial. The facts in that connection are somewhat as follows: After the prosecutrix herein had testified the court made the following announcement: "The jury having requested the Court to exclude spectators from the

court room, because of the age of the principals involved, and the nature of the case, and the Court feeling that their request is proper, all spectators are excluded from the Court Room, excepting the witnesses and interested parties." It appears from affidavits filed herein that after this order was made, all the spectators left the court room and many of them never returned, nor, apparently, were many requested to return. Counsel for the appellant objected to the order of the court except as to persons under 21 years of age. The court thereupon modified its order and finally stated: "If the attorneys for the defendant or for the state have any friends that they want to have in the court room, they may have their special friends in the court room, but the public that is here for the purpose of curiosity will be excluded, as the jury have indicated that they think this should be a trial in which the general public are here simply as spectators, and for no other purpose, and will be excluded because of the minority age of the parties and the character of the case. Both sides here, the complaining witness, her family, may have any friends in the court room that they wish, and the defense can do the same thing." According to the affidavits in the record, some persons who wanted to attend the trial were not permitted to do so. The number thereof is somewhat uncertain—perhaps one-half of that originally in the court room.

The Attorney General contends that the Constitution of this state does not guarantee a defendant in a criminal case a public trial. It is true that no specific provision to that effect is contained in the Constitution of this state along with the Constitutions of only three other states, namely, Massachusetts, New Hampshire and Virginia. But the Supreme Court of the United States has held that due process of law includes those immutable principles of justice which inhere in the very idea of free government (Holden vs. Hardy, 169 U. S.

366, 389), and those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions (Hebert vs. Louisiana, 272 U. S. 312, 316). And in the case of In Re Oliver, 333 U. S. 257, 273, 68 Sup. Ct. 499, the Supreme Court held that: "In view of this nation's historic distrust of secret proceedings, their inherent dangers to freedom, and the universal requirement of our federal and state governments that criminal trials be public, the Fourteenth Amendment's guarantee that no one shall be deprived of his liberty without due process of law means at least that an accused cannot" be sent to prison without a public trial. Hence, there seems to be but little choice for this court in determining whether anything less than that is meant by Section 8, Article 1 of our own Constitution which says that "All courts shall be open," and by Section 6 of Article 1 which provides that "No person shall be deprived of life, liberty or property without due process of law." However that may be, the authorities seem to be in agreement that a public trial was a common law right and since this state has adopted the common law, the right to a public trial is, in the absence of a statute—and we have none—as good a guarantee as though it were contained in our Constitution. As early as 1565, Sir Thomas Smith writing on the laws of England, wrote of the necessity of as many persons as might be present hearing what witnesses had to say. Sir Matthew Hale in 1670 wrote of the excellence of trials in England by reason of having the courts open to the public. See 6 Temple Law Quarterly 382. In Blackstone in his Commentaries, III, 373, the author states: "This open examination of the witnesses, 'viva voce,' in the presence of all mankind, is much more conducive to the clearing up of truth than the private and secret examination taken down before an officer or his clerk, in the ecclesiastical court and all others that have borrowed their practice from the civil law; where

a witness may frequently depose that in private which he will be ashamed to testify in a public and solemn tribunal." See also the statement of Jeremy Bentham, Rationale of Judicial Evidence as quoted in VI Wigmore On Evidence (3rd Ed.) Section 1834. In the case of Commonwealth vs. Fugmann, 330 Pa. 4, 198 Atl. 99, 111, the court states: "The essentials of a trial by jury of a defendant in a criminal case as known at the common law were: (1) A jury composed of twelve eligible persons duly summoned, sworn, and impaneled for the trial of the issue; (2) a plea entered; (3) an ample right of challenge both for cause and peremptorily, secured to defendant; (4) *a full, fair, and public trial* 'under the superintendence of a judge empowered to instruct them on the law and to advise them on the facts * * *;' (5) proper and sworn testimony for the jury's consideration; (6) unanimity of the vote supporting the verdict. * * * A departure from any of these essentials would be a deprivation of 'the right to trial by jury.'" See also Commonwealth vs. Blondin, 324 Mass. 564, 87 N. E. 2d 455.

The question then remains as to what constitutes a public trial in the absence of a provision of a statute, of which we have none. An annotation on the subject is contained in 156 A. L. R. 265, and see Wigmore on Evidence, supra, Section 1835, and notes thereto, 14 Am. Juris. 865, 23 C. J. S. 285. The classic text on the subject is 1 Cooley's Constitutional Limitations, (8th Ed.) page 647 where it is stated: "It is also requisite that the trial be *public*. By this is not meant that every person who sees fit shall in all cases be permitted to attend criminal trials; because there are many cases where, from the character of the charge and the nature of the evidence by which it is to be supported, the motives to attend the trial on the part of portions of the community would be of the worst character, and where a regard to public morals and public decency would re-

quire that at least the young be excluded from hearing and witnessing the evidences of human depravity which the trial must necessarily bring to light. The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions; and the requirement is fairly observed if, without partiality or favoritism, a reasonable proportion of the public is suffered to attend, notwithstanding that those persons whose presence could be of no service to the accused, and who would only be drawn thither by a prurient curiosity, are excluded altogether."

Courts generally concede that the right to have the members of the public present in a case of the character before us is subject to some limitations. "There is general agreement that spectators having no immediate concern with the trial need not be admitted in such numbers as to overcrowd the courtroom and take up room needed for those who do have special concern with the trial such as the court officers, jurors and witnesses, and the relatives and friends of the defendant. Moreover those spectators who are admitted must observe proper decorum and if their conduct tends in any way to interfere with the administration of justice in the court room they may, of course, be removed. Likewise there is agreement that in cases involving sexual offenses youthful spectators may be excluded when the evidence is likely to involve the recital of scandalous or indecent matters which would have a demoralizing effect upon their immature minds." United States vs. Kobli, 172 Fed. 2d 919, 922. So too, if a prosecuting witness in a case of the character before us is of such tender years as to be seriously embarrassed in giving her testimony by the presence of spectators not concerned with the trial, the trial judge in order to prevent

a miscarriage of justice may, during the witness' testimony, exclude all members of the public not directly concerned with the trial. United States vs. Kobli, supra, and cases cited. But in other respects there is much conflict in the authorities. See 35 Mich. L. R. 474-479. Some of the cases have given the trial court considerable discretion in excluding members of the public in a criminal trial. See State vs. Nyhus, 19 N. D. 326, 124 N. W. 71, State vs. Johnson, 26 Ida. 609, 144 P. 784. In the case of State vs. Beckstead, 96 Utah 528, 88 P. 2d 461, the majority of the court with two of the five judges holding otherwise, it was held that: "if the defendant is permitted to retain a reasonable number of relatives or friends of his own choosing, that insures him a public trial." That view cannot serve as a rule of universal application. It may well happen that a person might be arrested and tried for a crime such as is involved herein who has no acquaintances, no relatives and no friends in the community. Hence, only the presence of the public generally could insure him a public trial to which he is rightfully entitled. As stated in the case of State vs. Keeler, 52 Mont. 205, 156 P. 1080, while a public trial is primarily for the benefit of the accused, the situation "likewise involves questions of public interest and concern. The people are interested in knowing, and have the right to know, how their servants—the judge, county attorney, sheriff, and clerk—conduct the public's business." Most of the courts construe the requirement of a public trial rather strictly. See State vs. Keeler, supra, Rhoades vs. State, 102 Neb. 750, 169 N. W. 433, People vs. Yeager, 113 Mich. 228, 71 N. W. 491, State vs. Hensley, 75 Ohio St. 255, 79 N. E. 462, 9 L. R. A., N.S. 277, State vs. Osborne, 54 Ore. 289, 103 P. 62, Davis vs. United States, 247 F. 394, Tanksley vs. United States, 145 Fed. 2d 58, 156 A. L. R. 257, United States vs. Kobli, 172 Fed. 2d 919, People vs. Byrnes, 84 Cal. App. 2d 72, 190 P. 2d 290, Neal vs. State

(Okla. Cr.) 192 P. 2d 294. In the case last cited the court stated: "It appears from a consideration of these cases that the courts of all States whose constitutions guaranteed one accused of crime the right of public trial, were in agreement upon the proposition that the accused may insist upon the trial being absolutely open and public, except insofar as there is some good reason for excluding certain persons or classes, in which event these, and these only, may be excluded. It would appear that while the trial judge may for special causes exclude any spectators from the courtroom yet he cannot make the order of exclusion extend further than the special issues warrant in the particular case." In the case of People vs. Byrnes, supra, the California District Court of Appeals stated as follows: "Under normal conditions a public trial is one which is open to the general public at all times. This right of attendance may be curtailed under special circumstances without infringement of the constitutional right, but it cannot be denied altogether, nor can it be restricted except in cases of necessity. The most common of these is the necessity of preserving order and preventing interference with the proceedings. Here there was no actual or threatened disturbance of the proceedings in the trial of defendant and there was no necessity for the order of exclusion. Such being the case, the order was a clear deprivation of the right to a public trial." In the case of People vs. Yeager, Michigan case, supra, "the court excluded from the court room all persons not legitimately interested in the case, but announced that any friend or person that was connected or related to or interested in the defendant himself was not to be excluded; and, finally, in order to carry into effect the order, the court asked all the people to retire from the court room, and directed the officer in attendance to admit any who were relatives or friends of the defendant, and also permitted the representatives of the press." The order of exclu-

sion was, accordingly similar to the final order made in the case at bar, but was held to be error, the court saying among other things: "Who is to decide who are the friends of the accused? The law makes no such test, but allows all citizens freely to attend upon any trial, whether civil or criminal."

In People vs. Hartman, 103 Cal. 242, 37 P. 153, the court said: "The trial should be 'public,' in the ordinary common-sense acceptation of the term. The doors of the court room are expected to be kept open, the public are entitled to be admitted, and the trial is to be public in all respects, as we have before suggested, with due regard to the size of the court room, the conveniences of the court, the right to exclude objectionable characters and youth of tender years, and to do other things which may facilitate the proper conduct of the trial." In Beauchamp vs. Cahill, 297 Ky. 505, 180 S. W. 2d 423, the court's view is expressed as follows: "It cannot be doubtbed that a trial judge has authority to exclude the young from his court room during a trial where unsavory and vulgar evidence will be produced. Also, he may protect a child witness, who from the nature of the case must testify to revolting facts, by excluding morbid, prurient, curious and sensation-seeking persons from the court room, so long as he does not abuse his discretion and deprive the accused of the right to have his family and friends present as well as a reasonable portion of the public. Such limited exclusion of people from the court room when resorted to in the exercise of a reasonable and sound discretion does not violate * * * the Constitution granting the accused a public trial." But in State vs. Keeler, supra, the Montana court said: "Who shall determine whether a spectator is drawn to the courtroom by idle curiosity or by interest? What tests shall be applied and what shall constitute interest sufficient to justify his presence? Why should an exception be made in favor of a friend of the de-

fendant while the taxpayer, who is interested to know how the public servants—the judge, the county attorney, the sheriff, etc.—perform their work, is excluded? And why make an exception in favor of members of the bar who are not interested in the trial of the case?"

A thorough discussion of the question here involved is contained in the late case of United States vs. Kobli, 172 Fed. 2d 919, already heretofore cited. We shall not take the space of quoting therefrom, except to mention that it refers to Daubney vs. Cooper, 10 B. & C. 237, 240, 109 Eng. Rep. 438, 440 which states: "We are all of opinion, that it is one of the essential qualities of a Court of Justice that its proceedings should be public, and that all parties who may be desirous of hearing what is going on, if there be room in the place for that purpose—provided they do not interrupt the proceedings, and provided there is no specific reason why they should be removed—have a right to be present for the purpose of hearing what is going on."

It is apparent from what has been heretofore said that by the weight of authority a trial court should be cautious in making an order of exclusion of spectators from a trial, and should do so only when the public interest necessarily requires it. So it appears, that if the first order made by the trial court in this case had been carried into effect, it would have been reversible error. However, the order was modified and we must determine whether the trial in this case was a public trial in the light of that modified order and in the light of the size of the spectators who were permitted to be present.

The court reporter, at the end of his notes relating to the exclusion of spectators and objections thereto has this notation: "Whereupon, at the resumption of the trial, there were 35 or more people in the court room,

in the audience, as indicated by count by the court. And at various times throughout the trial thereafter, the number of spectators was viewed and counted by the court and reported as ranging from 40 to 45 persons."

The court in overruling the appellant's motion for arrest of judgment entered a written order, which was made a journal entry (and hence a part of the record according to Section 3-5406, Wyo. Comp. St. 1945), and made therein the following finding: "The court further finds that the order of exclusion from the court room complained of, provided that the parties might have any friends of either the defendant or complaining witness or their families in the court room, and that no one claiming to be a friend of any of the interested parties was excluded from the court room during the trial of said case, and that every person that the defendant or his attorneys asked to have admitted were so admitted; that at the time of ruling on said matter and thereafter the defendant objected; that there were 35 people in the audience in the court room consuming a major part of the seating capacity of said court room when said trial was resumed; and that at various times during the trial the Court counted the spectators in the audience, and that number ranged from 35 to 45 persons throughout the trial; that the jury requested the Court to exclude spectators from the court room because of the ages of the principals involved and the nature of the case and the character of the testimony that would be produced; that said court room was packed with spectators and into the hallway and stairs, at the time said order was made; that the Court required one bailiff to remain at the door and in the hall to maintain order and quiet and admit anyone the defendant or state requested."

The state in its answer brief in this court points out that in view of the number of spectators present at the

trial, it is clearly shown that the trial was public. Counsel for appellant do not in their reply thereto contend that the trial was not a public one, if the foregoing statements can be accepted as true. But they strenuously urge that these statements are not properly in the record before us and should be wholly disregarded. That, then, seems to be the crucial question in the case.

There must, of course, be some way by which the actual facts in connection with the number of persons present at a trial may be ascertained and shown in the record filed in the appellate court. Counsel for appellant contend that Section 3-5405, Wyo. Comp. St. 1945, prescribes what the transcript of the court reporter of the proceedings of a trial shall contain, and that that section makes no reference to any such notation made by him in this case as above mentioned. That is true. We think, however, that this section must be construed in pari materia with Section 1-624, Wyo. Comp. St. 1945, which, after enumerating what the stenographic notes of the court reporter shall contain, also enumerates "such other proceedings as the court may direct," which seems to cover the situation before us. The notation is in the record. This court cannot expunge it. McDonald vs. Mulkey, 29 Wyo. 99, 107, 210 P. 940. If the record does not speak the truth it should in a matter such as before us have been corrected in the trial court. 3 Am. Juris. 280, People vs. Buck, 46 Cal. App. 2d 558, 116 P. 2d 160. No motion to have such correction made appears to have been made in the trial court, nor was a motion for diminution of the record filed in this court. The presumption is that a judicial record speaks the truth (31 C. J. S. 796) ; that official acts have been properly performed (31 C. J. S. 799) ; and this presumption applies to the acts of a court stenographer or reporter (31 C. J. S. 816). We see accordingly no reason which would warrant us in disregarding the notation of the court reporter here in question.

Counsel for appellant also urge that the statement or finding contained in the order overruling the motion for arrest of judgment should not be considered by this court, counsel characterizing the order, or the major portion thereof, as an opinion of the trial court, and cases are cited that such opinions will be disregarded by the appellate court. The characterization is not apt. The order contains what it purports to do, namely, a special finding of fact or facts existing during the trial of the case. A finding by the trial court to the effect that the trial below was a public trial was accepted by the Supreme Judicial Court of Massachusetts in Commonwealth vs. Blondin, 324 Mass. 564, 87 N. E. 2d 455. In the case at bar the finding above mentioned was confined to facts tending to show that the trial was public, and if the court was authorized to make a finding at all it was highly proper to do so in connection with the motion for arrest of judgment, which motion though not shown in the record, was evidently in part based upon the contention that the defendant did not have a public trial. It is said in 4 C. J. S. 1250 that a special finding voluntarily made without request of either party will be considered merely as a general finding and will not be deemed a part of the record on appeal. The cases cited relate to civil cases. The rule cannot, we think, be applied to a situation such as that before us. As already stated there must be some way to show in the record the actual number of people present at the trial. Since the count was made by the trial judge, issues joined on the point between the state and the defendant would have been useless. A case closely in point herein is State vs. Croak, 167 La. 92, 118 So. 703. In that case the court accepted the statement of the trial judge to the effect that there was at all times during the trial a fair-sized audience in the court room. The supreme court said: "In the case at bar, as we have said, aside from the jury and the court officers, the order, issued by the judge,

permitted the relatives of the accused and of the prosecuting witness, also those who had some special interest in the case, and those who specially asked to be admitted, to be present. The trial judge says that at all times during the trial a fair-sized audience was present. We think that the accused had a 'public trial' within the meaning of the Constitution." In view of the foregoing authorities and the presumption of regularity of judicial proceedings, we think we should accept the findings above mentioned as correct. Nothing definite to the contrary appears in the record.

We have found no case of the nature of the case at bar in which the trial was held not to be a public trial, when the number of spectators was that shown in the case at bar. While we see no particular reason why anyone of age should have been excluded from the trial, yet we think that under the special facts in this case, we cannot definitely say that the defendant was denied a public trial.

It may not be amiss to add by way of epilogue that a case like that at bar is one which cannot help but be one to give society grave concern. The law attempts to protect girls under 18 years of age and makes it a serious crime to carnally know them. But what has been provided to warn boys under age not to follow allurement or their natural instincts? While everyone is presumed to know the law, yet, did the three boys who were here involved actually know it? Judging from the unconcernedness or recklessness of their conduct, there is some question on that point in our minds. The duty to impress upon them the seriousness of the crime here involved and save them from ruining their lives lies somewhere—primarily, of course, upon the parents, but one cannot but wonder whether (particularly in view of "the franker and more realistic attitude of the present day toward matters of sex"—United States vs. Kobli,

supra) the state and its functionaries should not lend a hand in calling the attention of boys under age to the law and impress upon them the grave consequences which may follow the violation thereof.

Finding no reversible error in the record, the judgment of the trial court is affirmed.

*Affirmed.*

RINER, C. J., and KIMBALL, J., concur.