**Robert C. ELMER, Appellant
(Defendant below),**

v.

**STATE of Wyoming, Appellee
(Plaintiff below).**

No. 3784.

Supreme Court of Wyoming.

Dec. 30, 1969.

Ernest Wilkerson, Donald R. Winship, Casper, for appellant.

James E. Barrett, Atty. Gen., Jack Speight, Asst. Atty. Gen., Cheyenne, for appellee.

Before GRAY, C. J., and McINTYRE, PARKER, and McEWAN, JJ.

Mr. Justice PARKER delivered the opinion of the court.

Robert C. Elmer was charged under the provisions of § 6–63(A), W.S.1957 (1969 Cumulative Supp.), with the forcible rape of Diana Flis, a 19-year-old, unmarried girl, on February 25, 1968. He was tried by jury, convicted, sentenced to a term of two to four years, and has appealed, charging various errors. The first four of these, although listed separately as identification, alibi, flight, and improbability of the testimony of the complaining witness, must be categorized and treated as aspects of a claimed insufficiency of the evidence to support the verdict and judgment. In addition to this first group, defendant charges error in the prosecutor's opening and closing statements, his use of law enforcement officers in questioning defense witnesses, which allegedly intimidated them during the trial, and the giving of an instruction to the jury some time after the case had been submitted to it. Counsel urge that either the giving of the instruction under the circumstances of this case or the misstatement of defendant's testimony by the prosecuting attorney in his closing argument justify a reversal and

that the total cumulative effect of all the points raised was to deny the defendant the fair trial to which he was entitled.

The basic facts concerning the alleged crime, although disputed in certain respects, are relatively simple, defendant's only challenge of them in the trial court being his absence from the scene of the crime. Without details, they are that between 11:20 and 11:30 p. m., Sunday, February 25, 1968, prosecutrix finished work and left the Paradise Valley Mini-Mart, a store where she was employed as the only evening clerk, and was unlocking her car, which had been parked nearby, when the defendant stepped out from behind a windbreak with a beer can opener in his hand. When she asked him what she could do for him she was told "inside," and made to unlock the door. She believed he wanted to rob the store, but after they had entered the building he told her he was going to rape her and despite her struggles undressed her, raped her, and left. After a few minutes when she recovered, she put on her coat only, carried her clothes and other articles to her car, and drove rapidly to her home in Paradise Valley some two miles away where she reported the matter to her cousins with whom she lived. They called the police and took her to a doctor. At their home or on the way to the hospital, she told her cousin, Ray Spearman, the man who raped her had been in earlier that evening and cashed a check. Later, when the sheriff's officers showed her a high school annual, she identified defendant's photograph as being that of the assailant. The examining doctor said he found no marks of physical violence on her body but testified to various findings, which caused him to conclude that the hairs about the entrance to the vagina were matted with dried fluid, that there was a blood blister on the hymenal ring, which was caused by a male penis, and that there was sperm in the vagina. Testimony was adduced from the officers and other witnesses who had

known something regarding the activities of either the prosecutrix or the defendant during the night of the crime.

The defendant absolutely denied any connection with the crime and said he knew nothing of the incident whatever. He testified that he had been in the vicinity of the Mini-Mart area during the evening of Sunday, February 25, 1968, between 10:10 and 10:15, that he parked, went inside, cashed a ten-dollar check, and bought two packages of cigarettes from Miss Flis, all of which took about five minutes.[1] He then drove across the street to the Para Hi Motel; waited about ten minutes for Rick Dawson; talked with him five minutes, giving him some cigarettes and an amount of money Dawson had wished to borrow; and thereafter drove away from Casper toward the Elmer residence at Red Buttes. He parked within three hundred yards of the home where he waited thirty or thirty-five minutes for the lights in the house to go off so he could pick up his suitcase, which he had left there preparatory to his leaving home, a matter he had been planning for some three weeks. After getting his luggage, he drove to the Bluebird store in Casper for a carton of cigarettes, the trip from his home to the store taking approximately ten or fifteen minutes. At the store he was required to wait for the cashing of his check some twenty or twenty-five minutes. When he left the Bluebird he went to the Jack Jones Garage for gasoline, arriving there "somewhere around 12 o'clock." He paid for the gasoline by check, talked to the attendant, Mr. Peckham; then went to the CY and Poplar Texaco station for six quarts of oil, again paying by check, stayed some forty-five minutes there; and left about 1 a. m. for Denver by way of Douglas.

■■ Defendant relied on certain witnesses to substantiate his time schedules, which counsel said would indicate the complete impossibility of his being at the scene

---

1. Defendant said his watch was broken and in the shop and that except at certain times when he observed clocks his statements regarding the time were approximations.

of the crime. On the other hand the State presented witnesses who, it urged, showed that the time sequence did not establish an alibi for defendant but that his appearance at the various places that night and his issuance of a check each time had obviously been planned to avert suspicion although he had later panicked and left town. The total incongruity between the evidence adduced by the State and that by the defendant presented a matter for the determination of the jury, which was entitled to judge the credibility of the witnesses and the weight to be given the testimony of each. In that connection, it should be mentioned that defendant's counsel repeatedly challenged the method by which the prosecuting witness had identified the defendant, saying that it was suggestive and improper.

### Alibi, Flight, Improbability of the Testimony of the Complaining Witness, and Identification

█ With the exception of the propriety of the circumstances surrounding the identification of defendant by the prosecuting witness, which aspect we will discuss later, the first four subjects argued by the appellant, i. e., identification, alibi, flight, and improbability of the testimony of the complaining witness, are not proper subjects to be considered by an appellate court. Such matters as developed by the evidence are all within the province of the finder-of-fact to determine under the instructions of the court and on appeal may not be disturbed unless the procedure is irregular or the evidence insufficient to substantiate the verdict and judgment. As to the sufficiency of the evidence, no authorities are cited and no persuasive argument advanced to show any lack of proper basis for the verdict and judgment. It is beyond question that the evidence of the State, if believed, showed that the alleged crime had been committed by defendant; but conversely, the evidence of defendant, if believed, showed that defendant was guiltless.

Directing our attention to the claimed irregularities as to the identification, Spearman said on the way to the hospital Miss Flis recalled that the person who assailed her had been in the store during the evening and cashed a check but did not know what his name was. Later, Harry Wampler, one of the deputy sheriffs who investigated the matter, said that when he arrived at the house Miss Flis told him she had been raped and described the male as being age 17 to 18, sandy red hair, 5–10 to 5–11, heavy set, reddish complexion, and that she could identify him if she saw a picture. He and the other officer then secured high school annuals from the principal, handed her the one for 1966, which she went through and indicated that she did not find the picture.[2] He opened the 1967 annual to a page and handed it to her and asked if she would start on that page and see if she could find the photograph. She looked on the page and identified the picture of Robert C. Elmer as the person who had assaulted her.

█ Defendant's argument of error in this aspect centers upon two matters, (1) the oral description of the prosecuting witness, particularly to the officers, was not that of Elmer, and (2) the identification which she made was influenced by the deputy sheriffs who handed her the annual opened at a certain page, thereby limiting the persons she could identify. No legal precedent is submitted to us as holding that either of these circumstances constituted prejudicial error or vitiated the verdict and judgment, and none occurs to us independently. Rather, it would seem that any inconsistency between the prosecutrix's original description of the assailant and the actual likeness of defendant would be a matter which the jury might take into consideration in judging the credibility of the witness. The same type of inference would apply to any suggestion which might or might not have been made by the deputy sheriff when he handed the prosecuting

---

2. There was no contention that defendant's photograph did appear in this annual.

witness the annual so that she could identify her attacker.

### Impropriety of the Prosecutor's Opening Statement

Prior to the trial, defendant's counsel filed a motion for a protective order, alleging that the prosecutor planned in his opening statement to "forecast hearsay details surrounding the complaint of the alleged victim of rape such complaint being made to her relatives * * * and to Deputy Sheriffs * * * following the alleged incident." Preceding the selection of the jury and the taking of testimony, the court ruled, "the proposed evidence of the State as to the complaint made by the prosecutrix to others following the alleged incident will be limited to the fact of the complaint, the fact of the making of the complaint, testimony as to the time and place, the persons to whom the complaint was made, and the observed condition of the prosecutrix at that time." After some argument by counsel contending that under the cases of State v. Holm, 67 Wyo. 360, 224 P.2d 500, and State v. Mau, 41 Wyo. 365, 285 P. 992, no evidence of the physical condition of the complaining witness should be permitted—the rationale of the rule therein stated being that a complaining witness should not be allowed to establish conditions or circumstances which would bolster or corroborate her contention that she had been raped—the judge maintained his position and added that the rule would be as stated at "44 Am Jur page 954."

Defendant, without pointing out any specific offending language, now argues that the prosecutor in the opening statement recounted hearsay details of the prosecutrix's testimony of complaint equivalent to her naming the defendant and that this as well as certain adduced testimony of her physical and emotional state shortly after the alleged crime was in violation of Wyoming cases. To substantiate his position that the complaint may be shown not for the purpose of establishing the fact of rape but a reaction on the part of the alleged victim, which if it had not occurred would have been contrary to the natural impulses of the woman, defendant quotes State v. Mau, supra, 285 P. at 995:

"* * * the state is entitled to prove only the fact of complaint with such particulars as are necessary to identify the subject-matter. Further terms of the utterance 'turn the statement into a hearsay assertion * * *'"

and State v. Holm, supra, 224 P.2d at 502 and 503:

"* * * while it may be permitted to be shown that the prosecutrix, in a case of rape, made a complaint immediately or soon after the alleged attack, details may not be shown under examination by the state. * * *

\*   \*   \*   \*   \*   \*

"* * * Most cases * * * that have passed on the question consider that the naming of the defendant is part of the details and so cannot be shown. * * * If, accordingly, the testimony of the prosecutrix is equivalent to naming the defendant, the order to strike should probably have been sustained. * * *"

Defendant says that when the allowance goes beyond this, such evidence becomes simply hearsay and inadmissible. The State responds that Mau and Holm merely hold it permissible to show that a prosecutrix was not silent about the rape but made a complaint, which view, as we will shortly indicate, lacks merit. Without reference to the State's unjustified position, the defendant's challenge in this aspect of the case raises several questions:

1. What were the holdings in Mau and Holm as to the admissible evidence concerning a complaint in a rape case?

2. Did the court's "protective" order exceed the latitude of such holdings?

3. Was such order self-effectuating and automatic without any objection to a violation thereof, and if so, did the State violate the order?

As to the first question, the purport of our decisions, Mau originally held and Holm reiterated not only that, as the

State contends, evidence of the complaint is admissible to show the prosecutrix's lack of silence about what had happened to her but also that the prosecution was entitled on direct examination to prove the fact of the complaint with such particulars as are necessary to identify the subject matter. This is the general rule as indicated in these decisions and is substantiated by the authorities therein, notably 4 Wigmore, Evidence, § 1136 (3 ed.). However, it is of more than passing interest to observe that neither of those cases purported to deal with the *exception* to the hearsay rule which holds admissible, in the words of Professor Wigmore, "the spontaneous declarations of a person suddenly excited by an extrinsic occurrence." 4 Wigmore, Evidence, § 1139, p. 230 (3 ed.). Neither do these cases pretend to announce any restriction on the evidence of a prosecutrix's physical appearance or condition after the attack, which is always relevant. Jackson v. State, 77 Okl.Cr. 160, 140 P.2d 606, 612; State v. Outen, 237 S.C. 514, 118 S.E.2d 175, 178 (certiorari denied 366 U.S. 977, 81 S.Ct. 1948, 6 L.Ed.2d 1266); 3 Underhill, Criminal Evidence, § 761 (5 ed.).

■ With regard to the trial court's "protective" order, a careful examination reveals that the pronouncement in response to defendant's request for the order did not exceed the latitude established by Mau and Holm in any particular, and there is no effort by defendant to point out any infringement.

■ We pass then to the question of whether or not such order was self-effectuating or automatic without any objection to a violation thereof and note that it was not. We have previously made it clear that, in line with the accepted rules governing proper administration of justice, objections if they are to be given any cognizance on appeal must be clearly and definitively made to the trial court so that they can there be resolved. Murdock v. State, Wyo., 351 P.2d 674, 679. No objection to the prosecutor's opening statement was interposed and had it been the court,

if objector's position were well taken, might at that point have stopped the trial. We hold again that a party may not review a record in retrospect and decide from that vantage point how the court should have ruled had an objection been made. Such rule is applicable to the other phase of this objection, the testimony. A reading of all of the pages of transcript mentioned by defendant as containing improper evidence reveals no objection to have been made except as to Spearman's testimony:

> "Oh, she come flying in the door, and I sleep pretty heavy, and she about tore it off when she came in, and she yelled at me, where Linda was, and I told her in the bedroom, and she just went right on in to the bedroom. * * * I got up, and I went over and shut the door, first of all, because it was pretty cold, and then I followed her down into the bedroom to see what was going on. * * * She was in my wife's arms, crying and sobbing hysterically."

Although the objection at that point is not clear, the witness was telling of the prosecutrix's condition and actions, not reciting her statements. As we have previously indicated, such answers were admissible. Defendant's claim of error in this segment is without merit.

### Improper Use of Sheriff's Officer in Interviewing Witnesses

■ Some days after the conclusion of the trial, defendant's counsel filed a motion for a new trial, raising the questions now before us on appeal. These include the one emanating from the prosecutor's causing of a uniformed sheriff's officer to visit the homes of certain witnesses the night before they were to testify, with a demand to know what testimony they would give and requirement that they accompany the officer to his car for interview. This part of the motion was supported by an affidavit of Tessie L. Townsend, who stated that an officer had come to her house on October 15, 1968, at 9:30 p. m., said that he wanted to find out what testimony she was

going to give in the Elmer case and she was then directed to come to his car in front of her house so that he might interrogate her as to the expected testimony and make notes thereon. She said that this visit created confusion in her mind as to "whether she should or should not testify in the case and as to what testimony and what would happen to her if she testified as a defense witness." The court overruled the motion for new trial. On that facet defendant here presented a number of authorities, including opinions of different courts, tending to condemn any interference with or intimidation or prejudice of witnesses during litigation, and holding that such activities may be subject to contempt procedure against the offender. Reference is also made by counsel to § 6-187, W.S.1957, relating to the intimidation of witnesses. However, defendant makes no effort to show that the interviews by the sheriff's officer in this case fell within any of the pronouncements in his citations but instead *assumes* that some violation occurred. Such an assumption is unwarranted. Further, even conceding arguendo the impermissibility of the questioning, there is nothing in the record to show that defendant was prejudiced by the interviews. For the reasons mentioned, this charge of error is without merit. State v. Spears, 76 Wyo. 82, 300 P.2d 551, 557. In so saying we do not wish to be understood as approving the type of interviews under the conditions asserted in the affidavit. Although nothing therein discloses a violation of Canon 39 of the Professional Ethics of the American Bar Association (as amended September 30, 1937), which permits interview of a prospective witness for the opposing side without consent of the opposite party, we think the circumstances here provided a potential opportunity for criticism. It would seem that the best administration of justice requires sufficient preparation by counsel as would allow interviews of witnesses, especially of those called by the opposing side, to be casual and routine, and well prior to the time of trial. Any emergency requiring a departure from that format should be made in a manner which would not only preclude pressures but also complaints that such had existed.

#### Instruction

██ The record shows that at 10 p. m., Thursday, October 17, 1968, after the jury had been out something less than eleven hours, the court asked the foreman for a report on the jury's deliberations and was told that they had not been able to reach a decision although they had taken three votes. The court suggested that they go to bed and after breakfast next morning try again, and he gave them the following instruction:

"Upon your report that you are unable to agree in the cause which has been submitted to you, I think it is my duty to remind you that this trial has, as a matter of course, been attended with large expense to the parties, and that you should make another effort to agree.

"To aid you in further consideration of the case, I instruct that, although the verdict to which a juror agrees must, of course, be his own verdict, the result of his own convictions, not a mere acquiescence in the conclusion of his fellows, yet in order to bring twelve minds to a unanimous result, you must examine the questions submitted to you with candor and with a proper regard and deference to the opinions of each other. You should consider that the case must at some time be decided; that you are selected in the same manner and from the same source from which any future jury must be selected, and there is no reason to suppose that the case will ever be submitted to twelve men more intelligent, more impartial or more competent to decide it, or that more and clearer evidence will be produced on the one side or the other, and with this in view, it is your duty to decide the case, if you can conscientiously do so.

"In conferring together you ought to pay a proper respect to each other's opinion and listen with a disposition to be convinced by each other's arguments, and, on the other hand, if the larger number of your panel are for conviction, a dissenting juror or jurors should further consider his or their contrary position, which makes no impression on the minds of so many men, equally honest and equally intelligent with himself, and who have heard the same evidence with the same attention and with an equal desire to arrive at the truth and under the sanction of the same oath; and on the other hand, if a majority are for the defendant, the minority ought seriously to ask themselves whether they may not reasonably and ought not to doubt the correctness of a judgment which is not concurred in by most of those with whom they are associated, and distrust the weight and sufficiency of that evidence which fails to convince their fellow jurors."

Counsel for defendant immediately objected to the instruction, and moved for a directed verdict, saying that it was apparent from the almost equal spread of the jury, which was known to be seven to five one way or the other, that there was a reasonable doubt as to the guilt of the defendant in the minds of the jury. They now say that the impact of such an instruction cannot be ascertained with any degree of certainty and insist that its tremendous potential for coercion of a jury is exemplified by the affidavit of one of the jurors who said that by 2 p. m. the day the verdict was returned she had concluded "if she did not accede to the majority opinion" that under the instruction of the previous night she would be in contempt of court. They argue that the instruction constituted a violation of due process and ask that this court recognize the inherent injustice and

the threat to due process that it places into the context of a criminal trial. Numerous cases are cited referring to or discussing various instructions which point out to the jury the desirability and necessity of the individual jurors considering the views of the others in arriving at a verdict. Counsel designate such instructions by several names, notably the "Allen" charge, since an instruction along that line was approved by the United States Supreme Court many years ago. Allen v. United States, 164 U.S. 492, 501–502, 17 S.Ct. 154, 41 L.Ed. 528. Counsel concede that such instructions have usually been upheld both in Federal and state courts but insist that in the light of the emphasis on the preservation of constitutional rights in recent United States Supreme Court cases reconsideration should here be given to the matter. In so doing, they refer to and discuss a certain fictional moving picture and divers law review articles. While in this instance we perceive no occasion for the trial court to have given the instruction when the jury had been out less than eleven hours, including the time for meals and incidental activities unconnected with a consideration of the cause, we are presented with nothing to show that the instruction was either unconstitutional or improper. An instruction similar to portions of the one in issue was approved by this court in Harris v. State, 23 Wyo. 487, 153 P. 881, 889, Ann.Cas.1917A 1201, and an identical instruction was approved in Nicholson v. State, 24 Wyo. 347, 157 P. 1013, 1015–1016.[3] Undoubtedly the trial court relied upon its propriety as it was justified in doing,[4] and no prejudice resulted to defendant. In so saying, we do not commend or even approve the giving of this type of instruction after the jury has been engaged in deliberation. Such would seem unnecessary since the finders of fact undoubtedly understand, if their instructions have been

3. Defendant concedes it was identical—although there is a variance in a few unimportant words.

4. For discussion of similar instructions and the majority of states which have approved, see Annotation, 100 A.L.R.2d 177, 182 ff.

proper, what they are expected to do, and there would seem no occasion either to coddle or direct them further. Additionally, the singling out of any instruction over others lacks full accord with the universal principle that the instructions should be read and considered together. State v. Jackson, 75 Wyo. 13, 291 P.2d 798, 803. Although, as we have indicated, the United States Supreme Court in recent decisions has declined to reverse because the instruction was given, there has throughout the Nation been a growing tendency to criticize the practice for various reasons. Judge Murrah in a recent case, United States v. Wynn, 10 Cir., 415 F.2d 135, 137, suggests that if such an instruction is given it should be incorporated with the other instructions. All this leads us to say that what little benefit to the proper administration of justice might result from the practice is far outweighed by the disadvantages.

### Impropriety of Prosecutor's Closing Argument

■ Appellant points out and criticizes a number of passages from the closing argument of the State as prejudicial error. Before addressing ourselves to the merits of these criticisms we must consider whether defendant is in a position to complain. No formal objection was made except one at a point immediately before the close of the argument in chief when the speaker referred to the jury as being those who determine the standards of the community and spoke of the growing crime rate in the Nation. The court sustained the objection, but there was no motion to have the statement stricken or to instruct the jury to disregard it. Earlier in the opinion, when we alluded to the prosecuting attorney's opening statement, we noted the necessity of preserving objection to any error relied upon as prejudicial and reversible, and we at that time called attention to Murdock v. State, supra, 351 P.2d at 679, discussing a similar problem but applying specifically to the taking of

testimony. On the same rationale, the necessity of an objection to a closing argument is a point which has often been separately discussed by the court. Perhaps the first time was in Horn v. State, 12 Wyo. 80, 73 P. 705, 727, where it was said that "to entitle such a matter as improper remarks of counsel to consideration in an appellate court, the record must show that proper objection thereto was made at the time, and overruled * * *." The ruling was reiterated in Bennett v. State, Wyo., 377 P.2d 634, 639; Cavaness v. State, Wyo., 358 P.2d 355, 358–359; and State v. Spears, 76 Wyo. 82, 300 P.2d 551, 562. Its basis is well known, i. e., the chance for mistrial ought not to be encouraged by permitting counsel to remain silent in the face of what he considers to be prejudicial misconduct of an adversary. We are not unaware of the difficulty attendant to any objection in open court, but we think that this can be minimized—perhaps by prearrangement with the court for a recess and discussion outside the jury's hearing of any violation which may occur. Of course, there may be cases where the misconduct of a prosecuting attorney is so flagrant that an appellate court would be warranted in reversing even in the absence of such objection, as was noted in State v. Wilson, 32 Wyo. 37, 228 P. 803, 809. We have, however, carefully read and reread the closing argument of the prosecuting attorney and find no such flagrant violation or fundamental error and from the rejection of the motion for new trial evidently neither did the trial court.

### Conclusion

As has been indicated in our discussion of the case, certain matters occurred in the trial of the cause which in retrospect might not meet ultimate standards. The law not being an exact science, such is often the case. However, we are unpersuaded that any one shortcoming here constitutes reversible error, and apparently counsel acknowledge that circumstance by relying

principally upon the total cumulative effect of all the asserted improprieties. As defendant submits, we recognize that reversal may be required because of a series of errors, no one of which is prejudicial alone, but it may occur only when the accumulated effect constitutes prejudice and the conduct of the trial is other than fair and impartial, a situation not borne out by analysis of the record in this case. Equally untenable is the suggestion that this court should as a matter of law determine on the evidence adduced and the facts of the case there is a reasonable doubt as to the guilt of the accused.

Affirmed.

Mr. Justice McINTYRE, with whom Mr. Justice McEWAN joins, concurring.

The most serious question presented in this appeal is whether the giving of the so-called Allen instruction was reversible error.

In view of the failure of the United States Supreme Court to declare the Allen charge unconstitutional or prejudicial *per se*, and in view of the fact that other courts have generally declined to reverse convictions where such a charge has been given, we feel we must concur in the result arrived at by our colleagues.

We do think it should be pointed out, however, as stated by Judge Murrah in Benscoter v. United States, 10 Cir., 376 F. 2d 49, 50, that the language of the Allen charge approaches the ultimate permissible limits of a judge's prerogative to guide and direct a jury toward a righteous verdict.

Also, as done in United States v. Brown, 7 Cir., 411 F.2d 930, 933–934, we think trial judges should be directed that henceforth, if a charge is given to a deadlocked jury, it should be consistent with the standards suggested by the American Bar Association. Such standards are delineated in the *Brown* opinion, and it is not necessary for them to be repeated.